## SPENCER *v.* KEMNA, SUPERINTENDENT, WESTERN MISSOURI CORRECTIONAL CENTER, ET AL.

No. 96–7171. Argued November 12, 1997—Decided March 3, 1998

1

SCALIA, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and O'CONNOR, KENNEDY, SOUTER, THOMAS, GINSBURG, and BREYER, JJ., joined. SOUTER, J., filed a concurring opinion, in which O'CONNOR, GINSBURG, and BREYER, JJ., joined, *post*, p. 18. GINSBURG, J., filed a concurring opinion, *post*, p. 21. STEVENS, J., filed a dissenting opinion, *post*, p. 22.

*John William Simon*, by appointment of the Court, 520 U. S. 1227, argued the cause and filed briefs for petitioner.

*James R. Layton*, Chief Deputy Attorney General of Missouri, argued the cause for respondents. With him on the brief were *Jeremiah W. (Jay) Nixon*, Attorney General, *pro*

*se,* and *Stephen D. Hawke, Stacy L. Anderson,* and *Michael J. Spillane,* Assistant Attorneys General.*

JUSTICE SCALIA delivered the opinion of the Court.

In his petition for a writ of habeas corpus, Randy G. Spencer seeks to invalidate a September 24, 1992, order revoking his parole. Because Spencer has completed the entire term of imprisonment underlying the parole revocation, we must decide whether his petition is moot.

I

On October 17, 1990, petitioner began serving concurrent 3-year sentences in Missouri on convictions of felony stealing and burglary. On April 16, 1992, he was released on parole, but on September 24, 1992, the Missouri Board of Probation and Parole, after hearing, issued an Order of Revocation revoking the parole. The order concluded that petitioner had violated three of the conditions, set forth in Missouri's Code of Regulations, Title 14, §80–3.010 (1992), that a Missouri inmate must comply with in order to remain on parole:

"NOW, THEREFORE, after careful consideration of evidence presented, said charges which warrant revocation are sustained, to wit:

---

*A brief of *amici curiae* was filed for the State of California et al. by *Daniel E. Lungren,* Attorney General of California, *George Williamson,* Chief Assistant Attorney General, *Ronald A. Bass,* Senior Assistant Attorney General, and *Morris Beatus* and *Peggy S. Ruffra,* Deputy Attorneys General, and by the Attorneys General for their respective States as follows: *Bruce M. Botelho* of Alaska, *Grant Woods* of Arizona, *Thurbert E. Baker* of Georgia, *Margery S. Bronster* of Hawaii, *Jeffrey A. Modisett* of Indiana, *Thomas J. Miller* of Iowa, *Scott Harshbarger* of Massachusetts, *Frank J. Kelley* of Michigan, *Joseph P. Mazurek* of Montana, *Don Stenberg* of Nebraska, *Frankie Sue Del Papa* of Nevada, *Heidi Heitkamp* of North Dakota, *W. A. Drew Edmondson* of Oklahoma, *D. Michael Fisher* of Pennsylvania, *Charles M. Condon* of South Carolina, and *Jan Graham* of Utah.

4

"#1–LAWS: I will obey all federal and state laws, municipal and county ordinances. I will report all arrests to my Probation and Parole Officer within 48 hours.

"#6–DRUGS: I will not have in my possession or use any controlled substance except as prescribed for me by a licensed medical practitioner.

"#7–WEAPONS: I will, if my probation or parole is based on a misdemeanor involving firearms or explosives, or any felony charge, not own, possess, purchase, receive, sell or transport any firearms, ammunition or explosive device or any dangerous weapon as defined by federal, state or municipal laws or ordinances." App. 55–56.

The specific conduct that violated these conditions was described only by citation of the parole violation report that the board used in making its determination: "Evidence relied upon for violation is from the Initial Violation Report dated 7–27–92." *Id.*, at 56.

That report, prepared by State Probation and Parole Officer Jonathan Tintinger, summarized a June 3, 1992, police report prepared by the Kansas City, Missouri Police Department, according to which a woman had alleged that petitioner, after smoking crack cocaine with her at a local crack house and later at his own home, pressed a screwdriver against her side and raped her. According to the Kansas City report, petitioner had admitted smoking crack cocaine with the woman, but claimed that the sexual intercourse between them had been consensual. Officer Tintinger's report then described his own interview with petitioner, at which petitioner again admitted smoking crack cocaine with the woman, denied that he had pressed a screwdriver to her side, and did not respond to the allegation of rape. Finally, after noting that "Spencer [was] a registered sex offender, having been given a five-year prison sentence for Sodomy in 1983," *id.*, at 75, Officer Tintinger's report tentatively recommended that petitioner's parole be continued, but that he be

placed in a drug treatment center. The report withheld making "an ultimate recommendation based on the alleged [rape and dangerous weapon] violations" until the prosecuting attorney's office had a chance to dispose of those charges. *Id.*, at 76. "In the event formal charges are ultimately filed," it said, "a separate recommendation will be forthcoming." *Ibid.* Petitioner was never charged, but a September 14, 1992, followup report prepared by Institutional Parole Officer Peggy McClure concluded that "there [did] appear to be significant evidence that Spencer ha[d] violated the conditions of his parole as stated," and recommended that petitioner's parole be revoked. *Id.*, at 64. Officer McClure's report is not mentioned in the Order of Revocation.

On being returned to prison, petitioner began his efforts to invalidate the Order of Revocation. He first sought relief in the Missouri courts, but was rejected by the Circuit Court of De Kalb County, the Missouri Court of Appeals, and, finally, the Missouri Supreme Court. Then, on April 1, 1993, just over six months before the expiration of his 3-year sentence, petitioner filed a petition for a writ of habeas corpus, see 28 U. S. C. § 2254, in the United States District Court for the Western District of Missouri, alleging that he had not received due process in the parole revocation proceedings.[1]

---

[1] Specifically, according to petitioner's brief, he contended:

"1. The Board denied him his right to a preliminary revocation hearing on the armed criminal action accusation. . . .

"2. The Board denied him a hearing on the cancellation of his conditional release date.

"3. The Board . . . :

"a. . . . denied him the right to confront and cross-examine any of the witnesses against him. . . .

"b. . . . gave him no notice that the entire case for revoking his parole would be the out-of-court statements in the violation report.

"c. . . . denied him the right to representation by a person of his choice.

"4. The Board failed to apprise him of the fact of its decision to revoke his parole, and of the evidence it relied on in doing so, for four months, when its regulations required that . . . the parolee be provided [such a]

Over petitioner's objections, the District Court granted the State two requested extensions of time to respond to the petition, deferring the deadline from June 2, 1993, until July 7, 1993. On July 14, 1993, after receiving the State's response, petitioner filed a lengthy "Motion and Request for Final Disposition of this Matter," in which he requested that the District Court expedite decision on his case in order to prevent his claim from becoming moot. Before the District Court responded to this motion, however, on August 7, 1993, petitioner was re-released on parole, and, two months after that, on October 16, 1993, the term of his imprisonment expired. On February 3, 1994, the District Court "noted" petitioner's July motion, stating that "[t]he resolution of this case will not be delayed beyond the requirements of this Court's docket." App. 127. Then, on August 23, 1995, the District Court dismissed petitioner's habeas petition. "Because," it said, "the sentences at issue here have expired, petitioner is no longer 'in custody' within the meaning of 28 U. S. C. § 2254(a), and his claim for habeas corpus relief is moot." Id., at 130.

The United States Court of Appeals for the Eighth Circuit affirmed the District Court's judgment,[2] concluding that, under our decision in *Lane* v. *Williams*, 455 U. S. 624, 632 (1982), petitioner's claim had become moot because he suffered no "collateral consequences" of the revocation order. 91 F. 3d 1114 (1996). (It acknowledged that this interpretation of *Lane* did not accord with that of the Second and Ninth Circuits in *United States* v. *Parker*, 952 F. 2d 31 (CA2 1991),

---

statement within ten working days from the date of the decision." See Brief for Petitioner 5–6.

[2] By the time the case reached the Eighth Circuit, petitioner was once again in prison, this time serving a 7-year sentence for attempted felony stealing. He is still there, and the State informs us that he is scheduled to be released on parole on January 24, 1999. See Brief for Respondents 8, n. 4.

and *Robbins* v. *Christianson,* 904 F. 2d 492 (CA9 1990).) We granted certiorari. 520 U. S. 1165 (1997).

## II

The District Court's conclusion that Spencer's release from prison caused his petition to be moot because it no longer satisfied the "in custody" requirement of the habeas statute was in error. Spencer was incarcerated by reason of the parole revocation at the time the petition was filed, which is all the "in custody" provision of 28 U. S. C. § 2254 requires. See *Carafas* v. *LaVallee,* 391 U. S. 234, 238 (1968); *Maleng* v. *Cook,* 490 U. S. 488, 490–491 (1989) *(per curiam).* The more substantial question, however, is whether petitioner's subsequent release caused the petition to be moot because it no longer presented a case or controversy under Article III, § 2, of the Constitution. "This case-or-controversy requirement subsists through all stages of federal judicial proceedings, trial and appellate. . . . The parties must continue to have a 'personal stake in the outcome' of the lawsuit." *Lewis* v. *Continental Bank Corp.,* 494 U. S. 472, 477–478 (1990). See also *Preiser* v. *Newkirk,* 422 U. S. 395, 401 (1975). This means that, throughout the litigation, the plaintiff "must have suffered, or be threatened with, an actual injury traceable to the defendant and likely to be redressed by a favorable judicial decision." *Lewis, supra,* at 477.

An incarcerated convict's (or a parolee's) challenge to the validity of his conviction always satisfies the case-or-controversy requirement, because the incarceration (or the restriction imposed by the terms of the parole) constitutes a concrete injury, caused by the conviction and redressable by invalidation of the conviction. Once the convict's sentence has expired, however, some concrete and continuing injury other than the now-ended incarceration or parole—some "collateral consequence" of the conviction—must exist if the suit is to be maintained. See, *e. g., Carafas, supra,* at 237–

238. In recent decades, we have been willing to presume that a wrongful criminal conviction has continuing collateral consequences (or, what is effectively the same, to count collateral consequences that are remote and unlikely to occur). See *Sibron* v. *New York*, 392 U. S. 40, 55–56 (1968).

The present petitioner, however, does not attack his convictions for felony stealing and burglary, which he concedes were lawful; he asserts only the wrongful termination of his parole status. The reincarceration that he incurred as a result of that action is now over, and cannot be undone. Subsistence of the suit requires, therefore, that continuing "collateral consequences" of the parole revocation be either proved or presumed. And the first question we confront is whether the presumption of collateral consequences which is applied to criminal convictions will be extended as well to revocations of parole. To answer that question, it is helpful to review the origins of and basis for the presumption.

Originally, we required collateral consequences of conviction to be specifically identified, and we accepted as sufficient to satisfy the case-or-controversy requirement only concrete disadvantages or disabilities that had in fact occurred, that were imminently threatened, or that were imposed as a matter of law (such as deprivation of the right to vote, to hold office, to serve on a jury, or to engage in certain businesses). Thus, in *St. Pierre* v. *United States*, 319 U. S. 41 (1943) *(per curiam)*, one of the first cases to recognize collateral consequences of conviction as a basis for avoiding mootness, we refused to allow St. Pierre's challenge to a contempt citation after he had completed his 5-month sentence, because "petitioner [has not] shown that under either state or federal law further penalties or disabilities can be imposed on him as a result of the judgment which has now been satisfied," *id.*, at 43. We rejected St. Pierre's argument that the possibility that "the judgment [could] impair his credibility as [a] witness in any future legal proceeding" was such a penalty or disability, because "the moral stigma of a judgment which no

longer affects legal rights does not present a case or controversy for appellate review." *Ibid.* Similarly, in *Carafas* v. *LaVallee*, we permitted an individual to continue his challenge to a criminal conviction only after identifying specific, concrete collateral consequences that attached to the conviction as a matter of law:

> "It is clear that petitioner's cause is not moot. In consequence of his conviction, he cannot engage in certain businesses; he cannot serve as an official of a labor union for a specified period of time; he cannot vote in any election held in New York State; he cannot serve as a juror." 391 U. S., at 237 (footnotes and citation omitted).

See also *Fiswick* v. *United States*, 329 U. S. 211, 221–223 (1946) (conviction rendered petitioner liable to deportation and denial of naturalization, and ineligible to serve on a jury, vote, or hold office); *United States* v. *Morgan*, 346 U. S. 502 (1954) (conviction had been used to increase petitioner's current sentence under state recidivist law); *Parker* v. *Ellis*, 362 U. S. 574, 576 (1960) (Harlan, J., concurring) (since petitioner's other, unchallenged convictions took away the same civil rights as the conviction under challenge, the challenge was moot); *Ginsberg* v. *New York*, 390 U. S. 629, 633, n. 2 (1968) (conviction rendered petitioner liable to revocation of his license to operate luncheonette business). Cf. *Tannenbaum* v. *New York*, 388 U. S. 439 (1967) *(per curiam); Jacobs* v. *New York*, 388 U. S. 431 (1967) *(per curiam).*

The gateway to abandonment of this fastidious approach to collateral consequences was *Pollard* v. *United States*, 352 U. S. 354 (1957). There, in allowing a convict who had already served his time to challenge the length of his sentence, we said, almost offhandedly, that "[t]he possibility of consequences collateral to the imposition of sentence [was] sufficiently substantial to justify our dealing with the merits," *id.*, at 358—citing for that possibility an earlier case involving consequences for an alien (which there is no reason to

believe Pollard was), see *Pino* v. *Landon*, 349 U. S. 901 (1955). In *Sibron* v. *New York*, we relied upon this opinion to support the conclusion that our jurisprudence had "abandoned all inquiry into the actual existence of collateral consequences and in effect presumed that they existed." 392 U. S., at 55 (citing *Pollard, supra*).[3] Thereafter, and in summary fashion, we proceeded to accept the most generalized and hypothetical of consequences as sufficient to avoid mootness in challenges to conviction. For example, in *Evitts* v. *Lucey*, 469 U. S. 387 (1985), we held that respondent's habeas challenge had not become moot despite the expiration of his sentence and despite the fact that "his civil rights, including suffrage and the right to hold public office, [had been] restored," *id.*, at 391, n. 4. Since he had not been pardoned, we said, "some collateral consequences of his conviction remain, including the possibility that the conviction would be used to impeach testimony he might give in a future proceeding and the possibility that it would be used to subject him to persistent felony offender prosecution if he should go to trial on any other felony charges in the future." *Ibid.* See also *Benton* v. *Maryland*, 395 U. S. 784, 790–791 (1969); *Pennsylvania* v. *Mimms*, 434 U. S. 106, 108, n. 3 (1977) *(per curiam); Minnesota* v. *Dickerson*, 508 U. S. 366 (1993).

There are several relevant observations to be made regarding these developments: First, it must be acknowledged that the practice of presuming collateral consequences (or of accepting the remote possibility of collateral consequences as adequate to satisfy Article III) sits uncomfortably beside the "long-settled principle that standing cannot be 'inferred argumentatively from averments in the pleadings,' but rather

---

[3] *Sibron* also purported to rely on *United States* v. *Morgan*, 346 U. S. 502 (1954), and *Fiswick* v. *United States*, 329 U. S. 211 (1946), as establishing that a "mere possibility" of collateral consequences suffices, see 392 U. S., at 54–55, but as we have described, those cases involved much more than that.

'must affirmatively appear in the record,'" and that "it is the burden of the 'party who seeks the exercise of jurisdiction in his favor,' 'clearly to allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute.'" *FW/PBS, Inc.* v. *Dallas*, 493 U. S. 215, 231 (1990) (citations omitted). The practice of presuming collateral consequences developed during an era in which it was thought that the only function of the constitutional requirement of standing was "to assure that concrete adverseness which sharpens the presentation of issues," *Baker* v. *Carr*, 369 U. S. 186, 204 (1962). *Sibron* appears in the same volume of the United States Reports as *Flast* v. *Cohen*, 392 U. S. 83 (1968), which said:

> "The question whether a particular person is a proper party to maintain the action does not, by its own force, raise separation of powers problems related to improper judicial interference in areas committed to other branches of the Federal Government. Such problems arise, if at all, only from the substantive issues the individual seeks to have adjudicated. Thus, in terms of Article III limitations on federal court jurisdiction, the question of standing is related only to whether the dispute sought to be adjudicated will be presented in an adversary context and in a form historically viewed as capable of judicial resolution." *Id.*, at 100–101.

See *Benton* v. *Maryland, supra*, at 790–791 ("Although this possibility [of collateral consequences] may well be a remote one, it is enough to give this case an adversary cast and make it justiciable"). That parsimonious view of the function of Article III standing has since yielded to the acknowledgment that the constitutional requirement is a "means of 'defin[ing] the role assigned to the judiciary in a tripartite allocation of power,'" *Valley Forge Christian College* v. *Americans United for Separation of Church and State, Inc.*,

454 U. S. 464, 474 (1982),[4] and "a part of the basic charter . . . provid[ing] for the interaction between [the federal] government and the governments of the several States," *id.*, at 476. See also *Lujan* v. *Defenders of Wildlife*, 504 U. S. 555, 559–560 (1992). And finally, of particular relevance to the question whether the practice of presuming collateral consequences should be extended to challenges of parole termination: In the context of criminal conviction, the presumption of significant collateral consequences is likely to comport with reality. As we said in *Sibron*, it is an "obvious fact of life that most criminal convictions do in fact entail adverse collateral legal consequences." 392 U. S., at 55. The same cannot be said of parole revocation.

For these reasons, perhaps, we have hitherto refused to extend our presumption of collateral consequences (or our willingness to accept hypothetical consequences) to the area of parole revocation. In *Lane* v. *Williams*, 455 U. S. 624 (1982), we rejected the contention of convicted felons who had completed their sentences that their challenges to their sentences of three years' mandatory parole at the conclusion of their fixed terms of incarceration (which parole they had violated) were not moot because the revocations of parole could be used to their detriment in future parole proceedings should they ever be convicted of other crimes. We said:

> "The doctrine of *Carafas* and *Sibron* is not applicable in this case. No civil disabilities such as those present in *Carafas* result from a finding that an individual has violated his parole." *Id.*, at 632.

> "*[Carafas]* concerned existing civil disabilities; as a result of the petitioner's conviction, he was presently

---

[4] The internal quotation is from a portion of *Flast* v. *Cohen*, 392 U. S. 83, 95 (1968), which recited this to be the second purpose of the case-or-controversy requirement in general. The opinion later said that the constitutionally required minimum of standing relates to the first purpose alone. *Id.*, at 100–101, quoted in text.

barred from holding certain offices, voting in state elections, and serving as a juror. This case involves no such disability." *Id.*, at 632–633, n. 13.

It was not enough that the parole violations found by the revocation decision would enable the parole board to deny respondents parole in the future, see *id.*, at 639–640 (Marshall, J., dissenting) (quoting Illinois rules governing denial of parole). For such violations "[did] not render an individual ineligible for parole under Illinois law[,] [but were] simply one factor, among many, that may be considered by the parole authority . . . ." *Id.*, at 633, n. 13. And, in any event, "[t]he parole violations that remain a part of respondents' records cannot affect a subsequent parole determination unless respondents again violate state law, are returned to prison, and become eligible for parole. Respondents themselves are able—and indeed required by law—to prevent such a possibility from occurring." *Ibid.* In addition, we rejected as collateral consequences sufficient to keep the controversy alive the possibility that the parole revocations would affect the individuals' "employment prospects, or the sentence imposed [upon them] in a future criminal proceeding." *Id.*, at 632. These "nonstatutory consequences" were dependent upon "[t]he discretionary decisions . . . made by an employer or a sentencing judge," which are "not governed by the mere presence or absence of a recorded violation of parole," but can "take into consideration, and are more directly influenced by, the underlying conduct that formed the basis for the parole violation." *Id.*, at 632–633.[5]

[5] The Court pointed out in *Lane* that respondents were attacking only their parole sentences, and not their convictions, see 455 U. S., at 631. That was evidently for the purpose of excluding direct application of *Sibron*. The Court also pointed out, near the conclusion of its opinion, that respondents were not attacking "the finding that they violated the terms of their parole." 455 U. S., at 633. This is not framed as an independent ground for the decision, and if it were such most of the opinion would have

14

We adhere to the principles announced in *Lane*, and decline to presume that collateral consequences adequate to meet Article III's injury-in-fact requirement resulted from petitioner's parole revocation. The question remains, then, whether petitioner demonstrated such consequences.

### III

Petitioner asserts four concrete injuries-in-fact attributable to his parole revocation. First, he claims that the revocation could be used to his detriment in a future parole proceeding. This possibility is no longer contingent on petitioner's again violating the law; he has already done so, and is currently serving a 7-year term of imprisonment. But it is, nonetheless, still a possibility rather than a certainty or even a probability. Under Missouri law, as under the Illinois law addressed in *Lane*, a prior parole revocation "[does] not render an individual ineligible for parole[,] [but is] simply one factor, among many, that may be considered by the parole authority in determining whether there is a substantial risk that the parole candidate will not conform to reasonable conditions of parole." 455 U. S., at 633, n. 13. Under Missouri law, "[w]hen in its opinion there is reasonable probability that an offender . . . can be released without detriment to the community or himself, the board may in its discretion release or parole such person." Mo. Rev. Stat. § 217.690 (1996). The Missouri Supreme Court has said that this statute "giv[es] the Board 'almost unlimited discretion' in whether to grant parole release." *Shaw* v. *Missouri Board of Probation and Parole*, 937 S. W. 2d 771, 772 (1997).

---

been unnecessary. The Court did not contest the dissenters' contention that "respondents . . . seek to have the parole term declared void, or expunged," *id.*, at 635 (Marshall, J., dissenting), which "would have the effect of removing respondents' parole-violation status and would relieve respondents of the collateral consequences flowing from this status," *id.*, at 636, n. 1.

Petitioner's second contention is that the Order of Revocation could be used to increase his sentence in a future sentencing proceeding. A similar claim was likewise considered and rejected in *Lane*, because it was contingent upon respondents' violating the law, getting caught, and being convicted. "Respondents themselves are able—and indeed required by law—to prevent such a possibility from occurring." *Lane, supra,* at 633, n. 13. We of course have rejected analogous claims to Article III standing in other contexts.

> "[W]e are . . . unable to conclude that the case-or-controversy requirement is satisfied by general assertions or inferences that in the course of their activities respondents will be prosecuted for violating valid criminal laws. We assume that respondents will conduct their activities within the law and so avoid prosecution and conviction." *O'Shea* v. *Littleton*, 414 U. S. 488, 497 (1974).

See also *Los Angeles* v. *Lyons*, 461 U. S. 95, 102–103 (1983).

For similar reasons, we reject petitioner's third and fourth contentions, that the parole revocation (and, specifically, the "finding of a parole violation for forcible rape and armed criminal action," see Brief for Petitioner 34) could be used to impeach him should he appear as a witness or litigant in a future criminal or civil proceeding; or could be used against him directly, pursuant to Federal Rule of Evidence 405[6] (or Missouri's state-law equivalent, see *Durbin* v. *Cassalo*, 321 S. W. 2d 23, 26 (Mo. App. 1959)) or Federal Rule of Evidence 413,[7] should he appear as a defendant in a criminal proceed-

---

[6] Federal Rule of Evidence 405 provides, in relevant part, that "[i]n cases in which character or a trait of character of a person is an essential element of a charge, claim, or defense, proof may . . . be made of specific instances of that person's conduct."

[7] Federal Rule of Evidence 413 provides, in relevant part, that "[i]n a criminal case in which the defendant is accused of an offense of sexual assault, evidence of the defendant's commission of another offense or of-

ing. It is purely a matter of speculation whether such an appearance will ever occur. See *O'Shea, supra,* at 496–497. Moreover, as to the possibility that petitioner (or a witness appearing on his behalf) would be impeached with the parole revocation, it is far from certain that a prosecutor or examining counsel would decide to use the parole revocation (a "discretionary decision" similar to those of the sentencing judge and employer discussed in *Lane, supra,* at 632–633); and, if so, whether the presiding judge would admit it, particularly in light of the far more reliable evidence of two past criminal convictions that would achieve the same purpose of impeachment, see *State* v. *Comstock,* 647 S. W. 2d 163, 165 (Mo. App. 1983). Indeed, it is not even clear that a Missouri court could legally admit the parole revocation to impeach petitioner. See *State* v. *Newman,* 568 S. W. 2d 276, 278–282 (Mo. App. 1978). And as to the possibility that the parole revocation could be used directly against petitioner should he be the object of a criminal prosecution, it is at least as likely that the conduct underlying the revocation, rather than the revocation itself (which does not recite the specific conduct constituting the parole violation) would be used.[8]

---

fenses of sexual assault is admissible, and may be considered for its bearing on any matter to which it is relevant."

[8] The dissent asserts that "a finding that an individual has committed a serious felony" renders the "interest in vindicating . . . reputation . . . constitutionally [s]ufficient" to avoid mootness. *Post,* at 23, 24. We have obviously not regarded it as sufficient in the past—even when the finding was not that of a parole board, but the much more solemn condemnation of a full-dress criminal conviction. For that would have rendered entirely unnecessary the inquiry into concrete collateral consequences of conviction in many of our cases, see, *e. g., Benton* v. *Maryland,* 395 U. S. 784, 790–791 (1969); *Carafas* v. *LaVallee,* 391 U. S. 234, 237–238 (1968); *Fiswick,* 329 U. S., at 220–222, and unnecessary as well (at least as to felony convictions) *Sibron's* presumption of collateral consequences, see *supra,* at 8–10. Of course there is no reason in principle for limiting the dissent's novel theory to felonies: If constitutionally adequate damage to reputation is produced by a parole board's finding of one more felony by a current inmate who

## IV

Petitioner raises three more arguments, none of which seems to us well taken. First, he contends that since our decision in *Heck* v. *Humphrey*, 512 U. S. 477 (1994), would foreclose him from pursuing a damages action under Rev. Stat. § 1979, 42 U. S. C. § 1983, unless he can establish the invalidity of his parole revocation, his action to establish that invalidity cannot be moot. This is a great non sequitur, unless one believes (as we do not) that a § 1983 action for damages must always and everywhere be available. It is not certain, in any event, that a § 1983 damages claim would be foreclosed. If, for example, petitioner were to seek damages "for using the wrong procedures, not for reaching the wrong result," see *Heck*, 512 U. S., at 482–483, and if that procedural defect did not "necessarily imply the invalidity of" the revocation, see *id.*, at 487, then *Heck* would have no application all. See also *Edwards* v. *Balisok*, 520 U. S. 641, 645–649 (1997); *id.*, at 649–650 (GINSBURG, J., concurring).

Secondly, petitioner argues in his reply brief that this case falls within the exception to the mootness doctrine for cases that are "capable of repetition, yet evading review." Reply Brief for Petitioner 5. "[T]he capable-of-repetition doctrine applies only in exceptional situations," *Lyons, supra*, at 109, "where the following two circumstances [are] simultaneously present: ' "(1) the challenged action [is] in its duration too short to be fully litigated prior to cessation or expiration, and (2) there [is] a reasonable expectation that the same complaining party [will] be subject to the same action again," ' " *Lewis*, 494 U. S., at 481 (quoting *Murphy* v. *Hunt*, 455 U. S. 478, 482 (1982) *(per curiam)*, in turn quoting *Weinstein* v.

---

has spent six of the last seven years in custody on three separate felony convictions, surely it is also produced by the criminal misdemeanor conviction of a model citizen. Perhaps for obvious reasons, the damage to reputation upon which the dissent would rest its judgment has not been asserted before us by petitioner himself.

*Bradford,* 423 U. S. 147, 149 (1975) *(per curiam)*); see also *Norman* v. *Reed,* 502 U. S. 279, 288 (1992). Petitioner's case satisfies neither of these conditions. He has not shown (and we doubt that he could) that the time between parole revocation and expiration of sentence is always so short as to evade review. Nor has he demonstrated a reasonable likelihood that he will once again be paroled and have that parole revoked.

Finally, petitioner argues that, even if his case is moot, that fact should be ignored because it was caused by the dilatory tactics of the state attorney general's office and the delay of the District Court. But mootness, however it may have come about, simply deprives us of our power to act; there is nothing for us to remedy, even if we were disposed to do so. We are not in the business of pronouncing that past actions which have no demonstrable continuing effect were right or wrong. As for petitioner's concern that law enforcement officials and district judges will repeat with impunity the mootness-producing abuse that he alleges occurred here: We are confident that, as a general matter, district courts will prevent dilatory tactics by the litigants and will not unduly delay their own rulings; and that, where appropriate, corrective mandamus will issue from the courts of appeals.

\*  \*  \*

For the foregoing reasons, we affirm the judgment of the Court of Appeals.

*It is so ordered.*

JUSTICE SOUTER, with whom JUSTICE O'CONNOR, JUSTICE GINSBURG, and JUSTICE BREYER join, concurring.

I join the Court's opinion as well as the judgment, though I do so for an added reason that the Court does not reach, but which I spoke to while concurring in a prior case. One of Spencer's arguments for finding his present interest ade-

quate to support continuing standing despite his release from custody is, as he says, that he may not now press his claims of constitutional injury by action against state officers under 42 U. S. C. § 1983. He assumes that *Heck* v. *Humphrey*, 512 U. S. 477 (1994), held or entails that conclusion, with the result that holding his habeas claim moot would leave him without any present access to a federal forum to show the unconstitutionality of his parole revocation. If Spencer were right on this point, his argument would provide a reason, whether or not dispositive, to recognize continuing standing to litigate his habeas claim. But he is wrong; *Heck* did not hold that a released prisoner in Spencer's circumstances is out of court on a § 1983 claim, and for reasons explained in my *Heck* concurrence, it would be unsound to read either *Heck* or the habeas statute as requiring any such result. For all that appears here, then, Spencer is free to bring a § 1983 action, and his corresponding argument for continuing habeas standing falls accordingly.

The petitioner in *Heck* was an inmate with a direct appeal from his conviction pending, who brought a § 1983 action for damages against state officials who were said to have acted unconstitutionally in arresting and prosecuting him. Drawing an analogy to the tort of malicious prosecution, we ruled that an inmate's § 1983 claim for damages was unavailable because he could not demonstrate that the underlying criminal proceedings had terminated in his favor.

To be sure, the majority opinion in *Heck* can be read to suggest that this favorable-termination requirement is an element of any § 1983 action alleging unconstitutional conviction, whether or not leading to confinement and whether or not any confinement continued when the § 1983 action was filed. *Heck* v. *Humphrey*, 512 U. S., at 483–484, 486–487. Indeed, although *Heck* did not present such facts, the majority acknowledged the possibility that even a released prisoner might not be permitted to bring a § 1983 action implying

the invalidity of a conviction or confinement without first satisfying the favorable-termination requirement. *Id.*, at 490, n. 10.

Concurring in the judgment in *Heck*, I suggested a different rationale for blocking an inmate's suit with a requirement to show the favorable termination of the underlying proceedings. In the manner of *Preiser* v. *Rodriguez*, 411 U. S. 475 (1973), I read the "general" § 1983 statute in light of the "specific" federal habeas statute, which applies only to persons "in custody," 28 U. S. C. § 2254(a), and requires them to exhaust state remedies, § 2254(b). *Heck* v. *Humphrey*, 512 U. S., at 497. I agreed that "the statutory scheme must be read as precluding such attacks," *id.*, at 498, not because the favorable-termination requirement was necessarily an element of the § 1983 cause of action for unconstitutional conviction or custody, but because it was a "simple way to avoid collisions at the intersection of habeas and § 1983." *Ibid.*

I also thought we were bound to recognize the apparent scope of § 1983 when no limitation was required for the sake of honoring some other statute or weighty policy, as in the instance of habeas. Accordingly, I thought it important to read the Court's *Heck* opinion as subjecting only inmates seeking § 1983 damages for unconstitutional conviction or confinement to "a requirement analogous to the malicious-prosecution tort's favorable-termination requirement," *id.*, at 500, lest the plain breadth of § 1983 be unjustifiably limited at the expense of persons not "in custody" within the meaning of the habeas statute. The subsequent case of *Edwards* v. *Balisok*, 520 U. S. 641 (1997), was, like *Heck* itself, a suit by a prisoner and so for present purposes left the law where it was after *Heck*. Now, as then, we are forced to recognize that any application of the favorable-termination requirement to § 1983 suits brought by plaintiffs not in custody would produce a patent anomaly: a given claim for relief from unconstitutional injury would be placed beyond the scope of

§ 1983 if brought by a convict free of custody (as, in this case, following service of a full term of imprisonment), when exactly the same claim could be redressed if brought by a former prisoner who had succeeded in cutting his custody short through habeas.*

The better view, then, is that a former prisoner, no longer "in custody," may bring a § 1983 action establishing the unconstitutionality of a conviction or confinement without being bound to satisfy a favorable-termination requirement that it would be impossible as a matter of law for him to satisfy. Thus, the answer to Spencer's argument that his habeas claim cannot be moot because *Heck* bars him from relief under § 1983 is that *Heck* has no such effect. After a prisoner's release from custody, the habeas statute and its exhaustion requirement have nothing to do with his right to any relief.

JUSTICE GINSBURG, concurring.

The Court held in *Heck* v. *Humphrey*, 512 U. S. 477 (1994), that a state prisoner may not maintain an action under 42 U. S. C. § 1983 if the direct or indirect effect of granting relief would be to invalidate the state sentence he is serving. I joined the Court's opinion in *Heck*. Mindful of "real-life example[s]," among them this case, cf. 512 U. S., at 490, n. 10, I have come to agree with JUSTICE SOUTER's reasoning: Individuals without recourse to the habeas statute because they are not "in custody" (people merely fined or whose sentences have been fully served, for example) fit within § 1983's "broad reach." See *id.*, at 503 (SOUTER, J., concurring in judgment); cf. *Henslee* v. *Union Planters Nat. Bank & Trust*

---

*The convict given a fine alone, however onerous, or sentenced to a term too short to permit even expeditious litigation without continuances before expiration of the sentence, would always be ineligible for § 1983 relief. See *Heck* v. *Humphrey*, 512 U. S. 477, 500 (1994) (SOUTER, J., concurring in judgment).

*Co.*, 335 U. S. 595, 600 (1949) (Frankfurter, J., dissenting) ("Wisdom too often never comes, and so one ought not to reject it merely because it comes late."). On that understanding of the state of the law, I join both the Court's opinion and JUSTICE SOUTER's concurring opinion in this case.

JUSTICE STEVENS, dissenting.

An official determination that a person has committed a crime may cause two different kinds of injury. It may result in tangible harms such as imprisonment, loss of the right to vote or to bear arms, and the risk of greater punishment if another crime is committed. It may also severely injure the person's reputation and good name.

In holding that petitioner's case is moot, the Court relies heavily on our opinion in *Lane* v. *Williams*, 455 U. S. 624 (1982) (opinion of STEVENS, J.). See *ante*, at 12–16. *Lane*, however, is inapposite. In *Lane*, the respondents did not seek to challenge the factual findings underlying their parole revocations. 455 U. S., at 633. Instead, they simply sought to challenge their sentences; yet because they had been released by the time the case reached us, the case was moot. *Id.*, at 631. "Through the mere passage of time, respondents ha[d] obtained all the relief that they sought." *Id.*, at 633.

In this case, petitioner challenges the factual findings on which his parole revocation was based. His parole was revoked based on an official determination that he committed the crime of forcible rape.[1] Assuming, as the Court does,

---

[1] Throughout the parole revocation proceedings, it was alleged that petitioner violated three parole conditions: Parole Condition #1, because he allegedly was guilty of rape; Parole Condition #6, because he allegedly used or possessed crack cocaine; and Parole Condition #7, because he allegedly used or possessed a dangerous weapon (*i. e.*, the screwdriver allegedly used during the rape). App. 60–64 (alleging violations of Conditions #1, #6, and #7); *id.*, at 72–76 (same); *id.*, at 112–114 (alleging violations of Conditions #1 and #6). Thus, when the parole revocation board declared, "after careful consideration of evidence presented," that petitioner vio-

that he had standing to bring that challenge while he remained in prison, the mootness question, as framed by the Court, is whether he continues to have " 'a "personal stake in the outcome" of the lawsuit' " that is likely to be redressed by a favorable decision. *Ante*, at 7.[2]

Given the serious character of a finding that petitioner is guilty of forcible rape, that question must be answered affirmatively. It may well be true that many prisoners have already caused so many self-inflicted wounds to their good names that an additional finding of guilt may have only a *de minimis* impact on their reputations. I do not believe, however, that one can say that about a finding that an individual has committed a serious felony.[3] Moreover, even if one may question the wisdom of providing a statutory remedy to redress such an injury, I surely cannot accept the view

---

lated Parole Conditions #1, #6, and #7, *id.*, at 55–56, it found that petitioner was guilty of forcible rape. See also Brief for Respondents 1 ("Spencer violated condition #1 by committing the crime of rape"). In addition, even apart from the rape finding, it is undisputed that the board found that petitioner used or possessed drugs, and that he used or possessed a dangerous weapon (which was only alleged to have been used during the rape). App. 55–56.

[2] The "personal stake in the outcome" formulation of the test, which has been repeatedly quoted in our cases, was first articulated in this excerpt from the Court opinion in *Baker* v. *Carr*, 369 U. S. 186, 204 (1962): "Have the appellants alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions? This is the gist of the question of standing."

[3] See, *e. g.*, *Liberty Lobby, Inc.* v. *Anderson*, 746 F. 2d 1563, 1568 (CADC 1984) (opinion of Scalia, J.) ("It is shameful that Benedict Arnold was a traitor; but he was not a shoplifter to boot, and one should not have been able to make that charge while knowing its falsity with impunity. . . . Even the public outcast's remaining good reputation, limited in scope though it may be, is not inconsequential"), vacated and remanded, on other grounds, 477 U. S. 242 (1986).

24

that an interest in vindicating one's reputation is constitutionally insufficient[4] to qualify as a "personal stake in the outcome."[5]  Indeed, in light of the fact that we have held

---

[4] While an individual may not have a "property" or "liberty" interest in his or her reputation so as to trigger due process protections, *Paul* v. *Davis*, 424 U. S. 693, 712 (1976), that question is obviously distinct from whether an interest in one's reputation is sufficient to defeat a claim of mootness.

[5] As we have stated: "[T]he individual's right to the protection of his own good name 'reflects no more than our basic concept of the essential dignity and worth of every human being—a concept at the root of any decent system of ordered liberty.'" *Gertz* v. *Robert Welch, Inc.*, 418 U. S. 323, 341 (1974) (quoting *Rosenblatt* v. *Baer*, 383 U. S. 75, 92 (1966) (Stewart, J., concurring)); see also *Milkovich* v. *Lorain Journal Co.*, 497 U. S. 1, 12 (1990) ("'[H]e that filches from me my good name/Robs me of that which not enriches him, And makes me poor indeed'" (quoting W. Shakespeare, Othello, act III, sc. 3)); *Paul* v. *Davis*, 424 U. S., at 706 ("The Court has recognized the serious damage that could be inflicted by branding a government employee as 'disloyal,' and thereby stigmatizing his good name"); *Wisconsin* v. *Constantineau*, 400 U. S. 433, 437 (1971) (emphasizing the importance of "a person's good name, reputation, honor, [and] integrity"; holding that respondent was entitled to due process before notices were posted stating that he was prohibited from buying or receiving alcohol); *In re Winship*, 397 U. S. 358, 363–364 (1970) ("[B]ecause of the certainty that [one found guilty of criminal behavior] would be stigmatized by the conviction . . . , a society that values the good name and freedom of every individual should not condemn a man for commission of a crime when there is reasonable doubt about his guilt"); *Wieman* v. *Updegraff*, 344 U. S. 183, 190–191 (1952) ("There can be no dispute about the consequences visited upon a person excluded from public employment on disloyalty grounds.  In the view of the community, the stain is a deep one; indeed, it has become a badge of infamy").

Indeed, vindicating one's reputation is the main interest at stake in a defamation case, and that interest has always been held to constitute a sufficient "personal stake." See, *e. g., Paul*, 424 U. S., at 697 ("[R]espondent's complaint would appear to state a classical claim for defamation actionable in the courts of virtually every State.  Imputing criminal behavior to an individual is generally considered defamatory *per se,* and actionable without proof of special damages"); *Gertz*, 418 U. S., at 349–350 ("We need not define 'actual injury' . . . .  Suffice it to say that actual injury is not limited to out-of-pocket loss.  Indeed, the more customary

that an interest in one's reputation is sufficient to confer standing,[6] it necessarily follows that such an interest is sufficient to defeat a claim of mootness.[7]

Accordingly, I respectfully dissent.[8]

---

types of actual harm inflicted by defamatory falsehood include impairment of reputation and standing in the community, personal humiliation, and mental anguish and suffering"); L. Eldredge, Law of Defamation §53, pp. 293–294 (1978) ("There is no doubt about the historical fact that the interest in one's good name was considered an important interest requiring legal protection more than a thousand years ago; and that so far as Anglo-Saxon history is concerned this interest became a legally protected interest comparatively soon after the interest in bodily integrity was given legal protection").

[6] *Meese* v. *Keene*, 481 U. S. 465, 472–477 (1987).

[7] There are compelling reasons for a court to consider petitioner's challenge to the parole board's findings sooner rather than later. As we stated in a related context:

"The question of the validity of a criminal conviction can arise in many contexts, and the sooner the issue is fully litigated the better for all concerned. It is always preferable to litigate a matter when it is directly and principally in dispute, rather than in a proceeding where it is collateral to the central controversy. Moreover, litigation is better conducted when the dispute is fresh and additional facts may, if necessary, be taken without a substantial risk that witnesses will die or memories fade. And it is far better to eliminate the source of a potential legal disability than to require the citizen to suffer the possibly unjustified consequences of the disability itself for an indefinite period of time before he can secure adjudication of the State's right to impose it on the basis of some past action." *Sibron* v. *New York*, 392 U. S. 40, 56–57 (1968) (citation omitted).

I also believe that, on the facts of this case, there are sufficient tangible consequences to the parole board's findings so as to defeat a claim of mootness.

[8] Given the Court's holding that petitioner does not have a remedy under the habeas statute, it is perfectly clear, as JUSTICE SOUTER explains, that he may bring an action under 42 U. S. C. §1983.