FUENTES, Circuit Judge,
dissenting in part.
I disagree with the majority that the police officers who arrested Gilíes, who was speaking in an open space at a public university, and whose speech was not likely to result in a breach of the peace, are entitled to qualified immunity. The officer who arrested Gilíes observed no conduct that amounted to a breach of the peace.
I also disagree that Petit’s First Amendment claim should be dismissed under Heck v. Humphrey, 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994), because, under Heck and Spencer v. Kemna, 523 U.S. 1, 118 S.Ct. 978, 140 L.Ed.2d 43 (1998), Heck’s favorable termination rule cannot be applied to dismiss a § 1983 claim brought by a plaintiff not in custody. Id. at 500, 114 S.Ct. 2364. I join in the remainder of the majority’s opinion.[15]
I. Gilíes’ Arrest
A. First Amendment violation
The essence of the majority opinion is that, though defendants may have violated Gilíes’ First Amendment rights, the law was not so clearly established as to deprive the officers of qualified immunity. I disagree because I believe that the officers violated long-standing, fundamental principles of First Anendment law.
To qualify as fighting words, speech must either be intended and likely to incite violence, or inherently likely to result in physical fighting. See Cohen v. California, 403 U.S. 15, 20, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971) (“There is ... no showing that anyone who saw Cohen was in fact violently aroused or that appellant intended such a result.”); Texas v. Johnson, 491 U.S. 397, 409, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989) (“asking whether the expression *213 is directed to inciting or producing imminent lawless action and is likely to incite or produce such action”) (internal quotation omitted); Johnson v. Campbell, 332 F.3d 199, 213 (3d Cir.2003) (“Johnson’s words were unpleasant, insulting, and possibly unwise, but they were not intended to, nor did they, cause a fight.”).[16]
Here there is no indication, and certainly no showing, that Gilíes acted with the intention of provoking violence. Therefore, we must consider whether the speech was by its nature very likely to result in physical fighting. Defendants argue that the crowd which had gathered before Gilíes was on the verge of riot when police officers arrived. I do not discern, from what little we can observe on the videotape on record, that the crowd was on the verge of riot. As the state court, which granted a writ of habeas corpus to Gilíes, noted, many listeners reacted to Gilíes’ speech “by being quietly attentive or simply laughing at the proceedings.” Besides Gilíes himself, the only noise comes from individuals in the crowd shouting at Gilíes and engaging in various heated exchanges with him. The crowd occasionally broke out into applause in their support.
In the videotape, Gilíes stands near a tree at a pedestrian intersection on a campus green. The only other people one can see for most of the tape are those passing by him on the pedestrian walkway. The crowd listening and engaging Gilíes is some distance away from him, as there is considerable empty space visible around Gilíes. As the majority describes the scene, at one point, one individual approached Gilíes to confront him, but that individual remained only briefly. Gilíes called him “cigarette-breath” as he walked away. As the majority notes, the records suggests that at some point someone also threw an apple that hit Gilíes’ briefcase, but this event is hardly noticeable on the tape and was hardly an act of physical intimidation.
The record does suggest that the police were told that the situation was “near riot” and that a fight might break out. However, I think it is clear that no fight was actually likely to break out. The students were certainly angry with Gilíes and wanted him off their campus, but there is no indication that they intended to force him off of the campus physically.
The police defendants were probably concerned upon arriving at the scene that angry people were shouting at each other and engaging in some name-calling. But “the First Amendment recognizes ... that a certain amount of expressive disorder not only is inevitable in a society committed to individual freedom, but must itself be protected if that freedom would survive.” City of Houston v. Hill, 482 U.S. 451, 472, 107 S.Ct. 2502, 96 L.Ed.2d 398 (1987). While “[t]o many, the immediate consequence of this freedom may often appear to be only verbal tumult, discord, and even offensive utterance[, tjhese are ... in truth necessary side effects of the broader enduring values which the process of open debate permits us to achieve.” Cohen, 403 U.S. at 24-25, 91 S.Ct. 1780.
Indeed, in this case, Gilíes provoked exactly the response desirable in a democracy: students responded to him by engaging in argument regarding important issues of religious and sexual tolerance and personal privacy.
Defendants argue that however benign the crowd’s behavior up until the time that Gilíes was arrested, his language was so *214 provocative that it was reasonable to assume that at some point violence would break out. It is very difficult to show, however, that words are inherently “likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest.” Hill, 482 U.S. at 461, 107 S.Ct. 2502 (quoting Terminiello v. Chicago, 337 U.S. 1, 4, 69 S.Ct. 894, 93 L.Ed. 1131 (1949)); see also Street v. New York, 394 U.S. 576, 592, 89 S.Ct. 1354, 22 L.Ed.2d 572 (1969) (“Though it is conceivable that some listeners might have been moved to retaliate upon hearing appellant’s disrespectful words, we cannot say that appellant’s remarks were so inherently inflammatory as to come within the small class of ‘fighting words’ which are likely to provoke the average person to retaliation.”) (internal quotation omitted).
The Supreme Court has long rejected the presumption that “an audience that takes serious offense at particular expression is necessarily likely to disturb the peace and that the expression may be prohibited on this basis.... On the contrary ... a principal function of free speech under our system of government is to invite dispute. It may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger.” Texas v. Johnson, 491 U.S. at 408-09, 109 S.Ct. 2533 (internal quotation omitted). The Court has explicitly held that it will “not permit[ ] the government to assume that every expression of a provocative idea will incite a riot, but [has] instead required careful consideration of the actual circumstances surrounding such expression.” Id. at 409, 109 S.Ct. 2533. The government in this case was not justified in presuming that university students, whose peculiar vocation it is to engage in free and open debate, “are standing ready to strike out physically at whomever may assault their sensibilities” so as to effectively censor dissidents. Cohen, 403 U.S. at 23, 91 S.Ct. 1780. As the Cohen court explained:
[While] [t]here may be some persons about with such lawless and violent proclivities ... that is an insufficient base upon which to erect, consistently with constitutional values, a governmental power to force persons who wish to ventilate their dissident views into avoiding particular forms of expression. The argument amounts to little more than the self-defeating proposition that to avoid physical censorship of one who has not sought to provide such a response by a hypothetical coterie of the violent and the lawless, the States may more appropriately effectuate that censorship themselves.
Id. at 23, 91 S.Ct. 1780.
The force of the defendant’s attempt to characterize Gilíes’ speech as “fighting words” derives almost entirely from the offensive character of his speech. Cf. Street, 394 U.S. at 592, 89 S.Ct. 1354 (“[A]ny shock effect of appellant’s speech must be attributed to the content of the ideas expressed. It is firmly settled that under our Constitution the public expression of ideas may not be prohibited merely because the ideas are themselves offensive to some of their hearers.”). Yet Ku Klux Klan members and neo-Nazis are permitted to march, notwithstanding the offense they cause to the vast majority of people. See Texas v. Johnson, 491 U.S. at 418, 109 S.Ct. 2533 (“The First Amendment does not guarantee that ... concepts virtually sacred to our Nation as a whole ... will go unquestioned in the marketplace of ideas.”) (citing Brandenburg v. Ohio, 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969)). “[W]e are often captives outsides the sanctuary of the home and subject to objectionable speech.” Cohen, 403 U.S. at *215 21, 91 S.Ct. 1780 (quotation omitted). People who do not want exposure to the offensive speech can avert their eyes or walk away. Id. at 21, 91 S.Ct. 1780. “If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable.” Texas v. Johnson, 491 U.S. at 414, 109 S.Ct. 2533. Neither embarrassing, disgraceful, shaming, vulgar nor offensive words are inherently fighting words. See Lewis v. City of New Orleans, 415 U.S. 130, 133-34, 94 S.Ct. 970, 39 L.Ed.2d 214 (1974); NAACP v. Claiborne Hardware Co., 458 U.S. 886, 910, 911, 102 S.Ct. 3409, 73 L.Ed.2d 1215 (1982); Gooding, 405 U.S. at 527, 92 S.Ct. 1103; Campbell, 332 F.3d at 212.
The majority suggests that at least those insults that Gilíes directed at a woman who identified herself as Christian and lesbian were fighting words. Gilíes taunted the woman: “oh, my, you ma'am are most confused. She thinks she’s a Christian lesbo. She’s a lesbian for Jesus.” He asked her, “do you lay down with dogs? Are you a bestiality lover? ... Can you be a bestiality lover and a Christian also?”
The government’s constitutional authority “to shut off discourse solely to protect others from hearing it is ... dependent upon a showing that substantial privacy interests are being invaded in an essentially intolerable manner.” Cohen, 403 U.S. at 21, 91 S.Ct. 1780. Although outrageous and offensive, Gilíes’ comments to this woman were made in the context of a speech in which he alleged that most Indiana University of Pennsylvania (‘TUP”) students were going to hell for their sexual degeneracy. The students he called out specifically, including the woman who identified herself as a Christian lesbian, were among those who chose to shout back at Gilíes and engage him. Gilíes clearly had no independent knowledge of any of these students, such that they could feel he was “revealing” actual information about their private lives. Gilíes was clearly using them as mere examples of his larger point about campus sexual mores.
Because Gilíes was not directing his comments to individuals in any meaningful sense, they are especially difficult to characterize as “fighting words.” “Fighting words” are “directed to the person of the hearer.” Cohen, 403 U.S. at 20, 91 S.Ct. 1780 (quotation omitted); see also Hess v. Indiana, 414 U.S. 105, 107-08, 94 S.Ct. 326, 38 L.Ed.2d 303 (1973); Texas v. Johnson, 491 U.S. at 409, 109 S.Ct. 2533. While in this case, several of Gilíes’ comments were ostensibly directed toward particular individuals in the course of exchanges initiated by them, the alleged personal insults were always delivered from a considerable physical distance and in the course of a sweeping sermon on sexual immorality.
Gilíes’ speech was provocative because of its content rather than because it contained words to which we would expect university students to react reflexively with violence. Nor were his words directed to individuals under circumstances that would lead the police to conclude that those individuals were likely to fight back physically. Because his speech was unlikely to result in violence, it clearly did not constitute “fighting words.” A reasonable officer would know that it fell outside the statutory prohibition against disorderly conduct.
B. Qualified Immunity
Notwithstanding the long line of Supreme Court cases cited above, the majority concludes that the officers were not on notice that Gilíes’ speech was constitutionally protected. To assess a qualified immunity claim, this Court must examine not *216 only “the law that was clearly established at the time of the alleged violation” but also “the facts available to the official at that time.” Paff v. Kaltenbach, 204 F.3d 425, 431 (3d Cir.2000). Contrary to the majority’s view, I believe the facts available to the officers at the time that they arrested Gilíes and Petit were sufficient to put them on notice of plaintiffs’ rights.
Admittedly, when officers Davis and Go-emmer arrived at the scene they had to rely on their observations and the reports of witnesses. The incident report suggests that most officers’ assessment of the situation was based primarily on the initial report of a possible fight and their observation of Gilíes shouting inflammatory language at the crowd. As explained above, the officers could not infer the prospect of violence from the content of Gilíes’ speech alone. Nor was it reasonable to rely on the initial report of a possible fight even after arriving at the scene and observing a purely verbal engagement. Although Officer Davis reports that he asked members of the crowd what was happening and spoke to one witness who identified herself as someone specifically affected by Gilíes’ remarks, the short time that passed between the officers’ arrival at the scene and their arrest of Gilíes suggests this questioning could not have been thorough. Moreover, the officers should have known that the only language remotely approaching fighting words was unlikely to result in lawlessness because those who allegedly had been attacked volunteered for an interview with the officers. Having just identified themselves to the police, these individuals were unlikely to strike out at Gilíes in the officers’ presence. In these circumstances, the officers acted too quickly in arresting Gilíes shortly after they arrived at the scene. Nothing they saw or heard in that brief time justified his arrest.
Even if the officers had a reasonable basis for believing that a breach of the peace might eventually occur, their concern could not justify a quick arrest. If the officers were worried that one or more students might physically assault Gilíes, the appropriate response would have been to stand guard to ensure that no violence erupted. Their mere presence should have been enough to deter a breach of the peace. It was not reasonable for the officers instead to ask Gilíes for a permit he did not need and then to arrest him.
III. Petit’s First Amendment Claim
I disagree with the majority’s view that the District Court properly dismissed Pet-it’s claim under Heck v. Humphrey, 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994).[17] Heck extended the common law principle that “civil tort actions are not appropriate vehicles for challenging the validity of outstanding criminal judgments ... to § 1983 damages actions that necessarily require the plaintiff to prove the unlawfulness of his conviction or confinement.” Id. at 486, 114 S.Ct. 2364.
Like the District Court, the majority assumes that the favorable termination rule in Heck applies to Petit’s claim. But because Petit was not in custody when he filed his § 1983 action, Heck does not ap *217 ply to his claims. Under the best reading of Heck and Spencer v. Kemna, 523 U.S. 1, 118 S.Ct. 978, 140 L.Ed.2d 43 (1998), the favorable termination rule does not apply where habeas relief is unavailable.
Justice Souter explained this construction of the rule in his concurrence in Heck:
[T]he alternative would needlessly place at risk the rights of those outside the intersection of § 1983 and the habeas statute, individuals not ‘in custody’ for habeas purposes. If these individuals (people who were merely fined, for example, or who have completed short terms of imprisonment, probation, or parole, or who discover (through no fault of their own) a constitutional violation after full expiration of their sentences), like state prisoners, were required to show the prior invalidation of their convictions or sentences in order to obtain § 1983 damages for unconstitutional conviction or imprisonment, the result would be to deny any federal forum for claiming a deprivation of federal rights to those who cannot first obtain a favorable state ruling. The reason, of course, is that individual not ‘in custody’ cannot invoke federal habeas jurisdiction, the only statutory mechanism besides § 1983 by which individuals may sue state officials in federal court for violating federal rights. That would be an untoward result.
Id. at 500, 114 S.Ct. 2364 (Souter, J., concurring).
Justice Souter pointed out that courts lack authority to subvert the “plain language” of § 1983 on the basis of a common law principle limiting collateral attack, especially where it “would run counter to § 1983’s history and defeat the statute’s purpose.” Id. at 501, 114 S.Ct. 2364 (Souter, J., concurring) (internal quotation omitted).
Justice Souter reiterated in his concurrence in Spencer that “Heck did not hold that a released prisoner in Spencer’s circumstances is out of court on a § 1983 claim, and ... it would be unsound to read either Heck or the habeas statute as requiring any such result.” Spencer, 523 U.S. at 19, 118 S.Ct. at 979 (Souter, J., concurring). He concluded instead that under a better reading of Heck, a prisoner who was no longer in custody, or who had never entered custody, “may bring a § 1983 action establishing the unconstitutionality of a conviction or confinement without being bound to satisfy a favorable termination requirement that it would be impossible as a matter of law for him to satisfy.” Id. at 21, 118 S.Ct. at 990 (Souter, J., concurring).
Justice Souter’s concurrence in Spencer was joined by Justices O’Connor, Ginsburg, and Breyer. Justice Stevens dissented but indicated that “it is perfectly clear, as Justice Souter explains, that [a petitioner who does not have a remedy under the habeas statute] may bring an action under 42 U.S.C. § 1983.” Id. at 25, 118 S.Ct. at 992 n. 8 (Stevens, J., concurring). Thus, a majority of the Spencer Court favored Justice Souter’s reading of Heck.[18]
This Court addressed a related issue in Torres v. Fauver, 292 F.3d 141 (3d Cir.2002). In Torres, we held that “the favorable termination rule does not apply to claims that implicate only the conditions, and not the fact or duration, of a prisoner’s incarceration.” Id. at 143. We observed that Torres’ § 1983 claim was cognizable unless the favorable termination applies to *218 “prison disciplinary sanctions that do not affect the fact or length of a prisoner’s confinement, and, more generally ... persons who cannot seek habeas relief.” Id. at 145. Because the Court found that the rule does not apply to sanctions that affect only the conditions of confinement, we did not reach the broader question of whether all those who cannot seek habeas relief are exempt from the favorable termination rule. Id. However, in a lengthy footnote, this Court pointed out that, after Spencer, a majority of the Supreme Court appears to support the broader exemption and, in a shorter footnote, we approvingly cited Justice Souter’s reading of Heck. Torres, 292 F.3d at 145 n. 5, 147 n. 8.
Other circuits, too, lean toward the more narrow construction of the favorable termination rule. In Jenkins v. Haubert, the Second Circuit held that a prisoner may bring a § 1983 claim “challenging the conditions of his confinement where the prisoner is unable to challenge the conditions through a petition for federal habeas corpus.” 179 F.3d 19, 21 (2d Cir.1999); see also Leather v. Eyck, 180 F.3d 420, 424 (2d Cir.1999) (holding that favorable termination rule did not apply to a defendant who “is not and never was in the custody of the State” because “he ... has no remedy in habeas corpus”). The Seventh Circuit agreed, indicating that it too is “hesitant to apply the Heck rule in such a way as would contravene the pronouncement of five sitting Justices.” DeWalt v. Carter, 224 F.3d 607, 616-17 (7th Cir.2000) (citation omitted). Finally, the Ninth Circuit also has indicated it will apply the narrower favorable termination rule. See Ramirez v. Galaza, 334 F.3d 850, 858 (9th Cir.2003) (holding Heck does not apply to § 1983 suits challenging constitutional errors which “do[] not affect the overall length of the prisoner’s confinement” because even if successful they “would not necessarily result in an earlier release from incarceration, and hence, do[] not intrude upon the ‘heart of habeas jurisdiction.’ ”).[19]
Justice Souter’s interpretation of the favorable termination rule is thus not only the better view, but also was the majority view of the Spencer Court and is the view among several courts of appeal. Accordingly, I believe the District Court erred when it applied Heck without considering whether Petit could have brought his claim under habeas, and if not, whether that placed him outside the scope of the favorable termination rule.
The majority bases its reasoning on three cases, two of which pre-date Heck. See Taylor v. Gregg, 36 F.3d 453 (5th Cir.1994); Roesch v. Otarola, 980 F.2d 850 (2d Cir.1992); Singleton v. City of New York, 632 F.2d 185 (2d Cir.1980). In all three cases, however, the favorable termination rule arose only because plaintiffs brought suits for malicious prosecution. Favorable termination was an element of the common law tort of malicious prosecution long before Heck extended it to certain other § 1983 claims. See 512 U.S. at 484, 114 S.Ct. 2364. Accordingly, the favorable termination rule indisputably applies to all claims of malicious prosecution regardless of whether habeas relief is available. But that fact clearly does not imply that the rule applies to all other § 1983 claims. Heck applies the rule to only those cases which, if successful, would render invalid a “conviction or sentence.” Id. at 486, 114 S.Ct. 2364. While Heck *219 extended the scope of the favorable termination rule in order to reconcile § 1983 with the federal habeas statute, § 1983 claims which cannot otherwise be pursued in a habeas petition are not subject to the rule. The cases on which the majority relies do not suggest otherwise.
I now turn to the critical question on this point: whether Petit could have brought a habeas petition instead of the present § 1983 action. The duration of Petit’s ARD program is not on record, but it could not have exceeded two years. See Pa. R.Crim. P. 316(B). Since Petit filed suit about one and a half years after his arrest, his ARD program was likely completed before he brought this suit. Thus, Petit could not have pursued habeas relief. See Carafas v. LaVallee, 391 U.S. 234, 238-40, 88 S.Ct. 1556, 20 L.Ed.2d 554 (1968) (holding that in making a custody determination, a court looks to the date that the habeas petition was filed).
Even if the ARD program was not complete when Petit initiated the instant action, based on my review of the record, I conclude that the ARD program never placed Petit “in custody” for habeas purposes. ARD is a pre-trial diversionary program, the purpose of which “is to attempt to rehabilitate the defendant without resort to a trial and ensuing conviction.” Commonwealth v. Feagley, 371 Pa.Super. 593, 538 A.2d 895, 897 (1988) (refusing to hear appeal from order terminating participation in ARD). “[AJccep-tance of ARD does not constitute a conviction” and “is not the equivalent of a conviction.” Id. at 897.
Although we do not know the precise conditions imposed upon Petit, they do not appear to have required Petit to report anywhere in Pennsylvania since his stated reason for entering ARD was to enable his return to Kentucky as quickly as possible for work. Cf. Dow v. Cir. Ct. of First Cir. Through Huddy, 995 F.2d 922, 923 (9th Cir.1993) (holding alcohol rehabilitation program that required defendant’s physical presence at a particular place significantly restrained his liberty and could be characterized as custody for habeas purposes). While Pennsylvania Rule of Criminal Procedure 316 provides that “[t]he condition of [the ARD program] may be such as may be imposed with respect to probation after conviction of a crime,” the conditions of Petit’s ARD program did not approach the normal conditions of parole. Cf. Jones v. Cunningham, 371 U.S. 236, 242-43, 83 S.Ct. 373, 9 L.Ed.2d 285 (1963) (holding individual confined by parole order to particular community, house, and job at the sufferance of his parole officer, who is under constant threat of reincarcer-ation, qualified as “in custody” for habeas purposes).
I therefore conclude that, even in the unlikely event that Petit was still in ARD at the time that he filed the present suit, his ARD program was not sufficiently burdensome to render him “in custody” for habeas purposes. Accordingly, the favorable termination rule does not apply to his claims and the dismissal of his claim on that basis was error.

. I join in the majority's opinion with respect to Gilíes’ challenge of the Indiana University of Pennsylvania (IUP) permit policy. I merely wish to add that Gilíes has no standing to bring his challenge because the permit policy is a reasonable, content-neutral policy that regulates commercial solicitation only, and therefore Gilíes raises no issue with respect to whether the permit policy "may cause others not before the court to refrain from constitutionally protected speech or expression.” Broadrick v. Oklahoma, 413 U.S. 601, 612, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973).

. Speech that results in violence is not necessarily inherently provocative, but in the absence of violence or any sign of impending violence it is especially difficult to show that certain words 'inherently' arouse listeners to violence.

. Because Petit's claims are not barred under Heck, the District Court should have addressed the merits of his First Amendment claim and engaged in a qualified immunity analysis with respect to his arrest. As the majority points out, the District Court was wrong to suggest that Petit's claim would fail merely because he did not literally speak; videotaping can constitute protected expression. See Smith v. City of Cumming, 212 F.3d 1332, 1333 (11th Cir.2000) (“The First Amendment protects the right to gather information about what public officials do on public property, and specifically, a right to record matters of public interest.”).

. The opinions of the Court in both Heck and Spencer do suggest in passing that Justice Scalia would not similarly limit the application of the favorable termination rule. See Spencer, 523 U.S. at 9, 118 S.Ct. 978; Heck, 512 U.S. at 490 n. 10, 114 S.Ct. 2364.

. Two circuits have rejected the more narrow reading of the favorable termination rule. See Randell v. Johnson, 227 F.3d 300, 301 (5th Cir.2000); Figueroa v. Rivera, 147 F.3d 77, 81 n. 3 (1st Cir.1998). For the reasons given, I think their reading of Heck and Spencer is not persuasive.