**Michelle HUANG, as next of friend of Raymond Yu, a minor, Plaintiff–Appellant,**

v.

**John A. JOHNSON, Commissioner for the Office of Children and Family Services, formerly known as the Division for Youth, Thomas McGregor, Ray Anderson, Matthew Barbour and Ivan Johnson, Defendants–Appellees.**

Docket No. 99–9226.

United States Court of Appeals, Second Circuit.

Argued May 2, 2000.

Decided May 17, 2001.

Lawrence Katz, New York, NY, for Plaintiff–Appellant.

Lee Alan Adlerstein, Assistant Attorney General (Eliot Spitzer, Attorney General of the State of New York, Robert A. Forte, Deputy Solicitor General, and Michael S. Belohlavek, Assistant Solicitor General, of counsel), New York, NY, for Defendants–Appellees.

Before FEINBERG, WINTER and CABRANES, Circuit Judges.

WINTER, Circuit Judge:

Michelle Huang appeals from Judge Casey's adverse grant of summary judgment in this 42 U.S.C. § 1983 action brought on behalf of her infant son, Raymond Yu. *See Huang v. Johnson,* No. 98 Civ. 5231, 1999 WL 760633 (S.D.N.Y. Sept.27, 1999). Huang argues that Yu's Fourteenth and Fourth Amendment rights were violated when appellees—all New York correctional officials—imprisoned him without due process and falsely. Specifically, Huang contends that: (i) Yu had a right to a hearing before appellees placed him in a residential facility instead of the less restrictive "day placement" program to which he had previously been assigned; and (ii) appellees illegally retained Yu in custody for eighty-three days by failing to credit to his juvenile sentence time served while in pre-trial incarceration at Riker's Island. Appellees assert that all of Huang's claims are barred by the Eleventh Amendment.

With regard to (ii), there is a threshold issue as to whether appellant's Section 1983 claims are barred by *Heck v. Humphrey*, 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994). *Heck* bars Section 1983 damages actions in which a judgment in the plaintiff's favor would necessarily imply the invalidity of a conviction or sentence where such conviction or sentence has not yet been invalidated, reversed on direct appeal, or called into question by the issuance of a writ of habeas corpus.

The district court held that the governing New York statutes did not give Yu either the right to a hearing prior to his placement in the residential facility or the right to credit for the time spent in pretrial incarceration at Riker's. The district court also held that Huang's claims for money damages were barred under the Eleventh Amendment because it construed her claims as brought against appellees in their official, rather than individual, capacities.

We hold that appellees have been sued in their individual capacities and that the Eleventh Amendment is no bar to this action. However, we affirm the district court's decision that Yu did not have a right to a hearing before his placement in the residential facility. With regard to the false imprisonment claim, we hold that *Heck* does not prevent this action. Nevertheless, whether Yu was detained beyond his statutory release date appears to turn upon whether a New York statute required appellees to credit Yu for the time he served at Riker's. The testimony of New York's correctional officials suggests some confusion over calculating the sentences of juveniles in Yu's circumstances, and there is no New York caselaw establishing the proper interpretation of the governing statute. Given the number of prisoners whose prison terms might depend on that interpretation, we certify the issue to the New York Court of Appeals. We retain jurisdiction over this appeal pending a response by that court.

## BACKGROUND

This appeal raises issues concerning the calculation under New York law of the term of a juvenile delinquent's confinement with the Office of Children and Family Services ("OCFS") when the juvenile is incarcerated in a non-OCFS correctional facility on an unrelated but pending criminal charge. Appellant contends that, under New York Executive Law § 510–b (7), time spent in a non-OCFS correctional facility on an unrelated charge must be credited against the juvenile's sentence with OCFS, unless the juvenile has been convicted on the unrelated charge before his sentence with OCFS expires. Appellees argue, however, that as long as the unrelated charge ultimately results in a conviction—or, alternatively, even if it does not—time served in a non-OCFS facility cannot be credited to the juvenile's sentence with OCFS.

The facts are essentially undisputed. Yu was adjudicated a juvenile delinquent on March 18, 1996, for attempted assault in the second degree. He was sentenced to eighteen months' confinement with New York's Division for Youth ("DFY"), now known as OCFS. Yu's release date was set for September 13, 1997.[1] Initially, Yu served his OCFS confinement at the Ella McQueen Residential Center, a limited secure-status facility where residents are allowed to leave the premises only for appointments relating to school, jobs, court

---

1. It appears that the actual initial placement ran the full eighteen months, until September 17, 1997, but that Yu was awarded a four-day detention credit, bringing his release date to September 13, 1997.

hearings, or medical treatment. On January 17, 1997, Yu's guardians consented to OCFS's suggestion that Yu be transferred from Ella McQueen to OCFS's Brooklyn Evening Reporting Center ("ERC") day placement program.[2] An ERC is less restrictive than a residential center in that it provides daily, evening, and weekend supervision but permits participants to live at home. The "Parental Consent" form, signed by Yu's guardians prior to his entry in the ERC, states that "the Division of Youth may also choose to terminate this arrangement if satisfactory progress has not been made according to the Division" and confirms Yu's "agree[ment] to follow the Conditions of Participation for the program." One of those conditions was that Yu report to the program daily. The attachment to the "Conditions of Participation" form, which also was signed by Yu, states that upon failure to comply with any of the conditions, "the Division for Youth may transfer you to a residential program" or a "different level of DFY program" and, "in addition, the Division for Youth may request that the court extend your time of placement."

Yu was AWOL—did not report to the program—from March 22 until March 24, 1997. Consequently, his release date was set back two days, to September 15, 1997, to account for this absence. On March 28, Yu was again AWOL—this time for ninety-six days—until July 2, 1997. On that date, OCFS discovered that Yu was being held in the custody of the New York City Department of Corrections at Riker's Island on an unrelated charge following an

arrest for conduct during the AWOL period.[3] Yu's OCFS release date was set back by ninety-six days, to December 20, 1997, to reflect the AWOL period.

Yu was held at Riker's until September 23, 1997, at which time he was returned to OCFS. On the date of his return to OCFS custody, the charge for which Yu had been held at Riker's was still pending. Upon his return, Yu was placed in Ella McQueen, the residential center, rather than in the ERC program that had allowed him to live at home. Furthermore, OCFS set back Yu's release date by another eighty-three days to reflect the period from July 2 to September 23, 1997, during which Yu was at Riker's. Consequently, Yu's new release date was March 13, 1998.

On February 11, 1998, appellee Ivan Johnson, one of Yu's OCFS counselors, sought in New York County Family Court to extend Yu's placement with OCFS by six months. Both Huang and Yu were served with notice of the hearing to extend placement, which was set for March 3, 1998. After the hearing, the Family Court allowed a temporary extension of Yu's placement until April 23, 1998, at which time he was released from OCFS custody. Yu pleaded guilty to the charge for which he was incarcerated at Riker's—second degree attempted murder—but not until May 27, 1998, a month after his release from OCFS custody.[4]

In July 1998, Huang filed the instant Section 1983 action, alleging that appellees, both in their official and individual capacities: (i) violated Yu's Fourteenth

---

2. At that time, Yu's guardians were his aunt and uncle, and it was at their home that Yu was to reside while he participated in the ERC.

3. The date of Yu's incarceration at Riker's is unclear, but we will assume it to be July 2. It appears that OCFS's records reflect that Yu's

AWOL period was deemed to end on that date.

4. Following his plea, Yu was sentenced to five years' probation for second degree attempted murder but, because of his status as a youthful offender, the conviction was deemed vacated.

Amendment rights by imprisoning him without due process when they reinstated him at Ella McQueen instead of at the ERC without a hearing; (ii) violated Yu's Fourth and Fourteenth Amendment rights by not crediting to his OCFS sentence the 83 days served at Riker's, thereby falsely imprisoning him from December 20, 1997 until April 23, 1998; and (iii) conspired to deprive Yu of his civil rights in violation of 42 U.S.C. § 1985. Huang sought both injunctive relief and $50 million in damages, plus attorneys' fees. After Huang moved for summary judgment, appellees moved for judgment on the pleadings. Pursuant to Fed.R.Civ.P. 12(c), the district court treated appellees' motion as a motion for summary judgment and granted appellees judgment as a matter of law on all claims. *See Huang*, 1999 WL 760633, at *2.

The district court held that, because "it is highly unlikely that [money damages] would be paid from the pocket of the individual Defendants, rather than the state," appellees were being sued in their official rather than individual capacities. The court therefore held that the claim for money damages was barred by the Eleventh Amendment. *See id.* at *2–*3. The district court further held that Yu did not have a right to a hearing upon his reinstatement at Ella McQueen, both under the governing New York statute, *see* N.Y. Exec. Law § 502–a, and because "the ERC consent form clearly states that ERC participation is a privilege, rather than an entitlement." *Huang*, 1999 WL 760633, at *4. Finally, the district court denied the false imprisonment claim and found that Yu's sentence was correctly calculated. It

reasoned that Yu was not entitled to credit for time served at Riker's because New York Executive Law § 510–b(7) clearly states that no credit is to be received for time served on an unrelated arrest that culminates in a conviction. *See id.*[5] This appeal followed. At oral argument, the panel requested that counsel address by supplemental briefing the impact on this litigation of *Heck.*

## DISCUSSION

■ We review the district court's grant of summary judgment *de novo. See Nabisco, Inc. v. Warner–Lambert Co.*, 220 F.3d 43, 45 (2d Cir.2000). Summary judgment is appropriate when, after reviewing the evidence in the light most favorable to the non-moving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Brown v. C. Volante Corp.*, 194 F.3d 351, 354 (2d Cir.1999).

### a) *The Eleventh Amendment*

■ The Eleventh Amendment[6] bars a suit against a state in federal court unless that state has "consented to the litigation or Congress has permissibly enacted legislation specifically overriding the state's immunity." *Russell v. Dunston*, 896 F.2d 664, 667 (2d Cir.1990) (citations omitted). Moreover, because state immunity extends to state officers who act on behalf of the state, *see Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 142–47, 113 S.Ct. 684, 121 L.Ed.2d 605 (1993), where the state is

---

**5.** The district court dismissed the Section 1985 claim because Yu failed to demonstrate the required "class-based animus." *Huang*, 1999 WL 760633, at *5. The Section 1985 claim has been abandoned on appeal.

**6.** The Eleventh Amendment reads: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI.

the "real, substantial party in interest," the Eleventh Amendment generally bars federal court jurisdiction over actions against state officials acting in their official capacities, *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101–02, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984). To be sure, suits for injunctive relief against state officers, rather than against the state itself, are permitted, provided the relief sought is prospective. *See Edelman v. Jordan*, 415 U.S. 651, 676–77, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974). However, Huang seeks money damages as well as prospective injunctive relief. For the damages claim to go forward, therefore, it must have been brought against appellees in their individual capacities. The district court concluded that, given the size of Huang's requested award—$50 million— "it is highly unlikely that the money would be paid from the pocket of the individual Defendants, rather than the state." *Huang*, 1999 WL 760633, at *3. The district court therefore found the state to be the real party in interest, thereby defeating the damages claim altogether under the Eleventh Amendment. *See id.*[7]

■ We disagree. The complaint expressly named each of the appellees in their individual capacities. The fact that the award sought by Huang is so large that appellees might not be able to pay it on their own does not transform the claim into one against appellees in their official capacities. *Cf. Farid v. Smith*, 850 F.2d 917, 923 (2d Cir.1988) ("[T]he law is clear that a state's voluntary decision to indemnify its public servants does not transform a personal-capacity action against a state official into an official-capacity action

against the state."); *Sales v. Grant*, 224 F.3d 293, 298 (4th Cir.2000) ("[I]t is the entity's potential legal liability, rather than its ability or inability to require a third party to reimburse it, or to discharge the liability in the first instance, that is relevant . . . .") (quoting *Regents of the Univ. of Cal. v. Doe*, 519 U.S. 425, 431, 117 S.Ct. 900, 137 L.Ed.2d 55 (1997)).[8]

The vast majority of Section 1983 actions that we see involve circumstances in which the state has agreed to indemnify the individual defendants for any liability incurred. Absent that voluntary act, the state would not be liable. We acknowledge that, in the present age of multitudinous Section 1983 actions, promises of indemnification may be necessary to hire a work force. Nevertheless, economic necessity does not alter the fact that the individual state officials are personally liable for judgments in cases such as the present one, and to hold otherwise would transfer Eleventh Amendment immunity to such individuals.

The district court's ruling was based largely on *Ford Motor Co. v. Dep't of Treasury*, 323 U.S. 459, 65 S.Ct. 347, 89 L.Ed. 389 (1945). However, that case involved a suit under a state statute for a "'refund,' not for the imposition of personal liability on individual defendants for sums illegally exacted." *Id.* at 464, 65 S.Ct. 347. In the present case, by contrast, Huang seeks to impose personal liability.

b) *Yu's Entitlement to a Hearing Prior to Transfer to Ella McQueen*

The district court also held that Yu was not entitled to a due process hearing when,

---

7. The complaint also sought a declaratory judgment as relief, but no party has discussed this claim on appeal. We shall follow their example, save for this footnote.

8. Appellees argue that they were not personally involved in the alleged deprivations. However, whether appellees have viable personal defenses, such as qualified immunity or lack of personal involvement, is left to future proceedings in the district court, if any.

upon his return to OCFS custody from Riker's, he was placed in Ella McQueen rather than the ERC. We agree and hold that the placement in a somewhat more restricted facility did not implicate a protected liberty interest requiring a hearing.

The New York statute provides: "It shall be within the discretion of the director to modify or terminate a youth's participation in day placement at any time. If the day placement is terminated the youth shall be immediately placed in a residential facility consistent with the court order." N.Y. Exec. Law § 502–a. Ella McQueen is precisely such a residential facility. New York law further provides that the "director may terminate a youth's participation in a day placement program at any time, for good cause other than the youth's breach of conditions of participation. The director shall issue a notice of termination in writing which shall state the reasons for the termination." N.Y. Comp.Codes R. & Regs. tit. 9, § 178.13(b). Appellees have stated that Yu's transfer was made because: (i) Yu posed a security risk because the Riker's charges involved first degree gang assault and second degree murder; (ii) he had a history of fleeing; and (iii) OCFS determined that he had not made satisfactory progress in light of his going AWOL, a "Major Rule Violation." Yu's history clearly supports that determination. Although it is unclear whether the director ever gave a formal "written notice of termination," Yu does not challenge the lack of post-transfer notice but rather contends that he had a right to pre-transfer notice of the charges against him and a hearing on those charges.[9] The relevant statutes do not provide that right. *See* N.Y. Exec. Law § 502–a; N.Y. Comp.Codes R. & Regs. tit. 9, § 178.13(b).

■ Alternatively, Huang contends that there is no meaningful difference between an ERC-participant's status and that of individuals in New York State "aftercare" programs or those on parole generally, both of whom are entitled to hearings before such status is revoked. *See* N.Y. Comp.Codes R. & Regs. tit. 9, § 169.4 (providing hearing when release from aftercare is revoked). We disagree. New York law expressly distinguishes between a "day placement" program, which is a "program for youth placed with the division which is an alternative to or includes a period of residential placement," N.Y. Exec. Law § 502–a, and an "aftercare program," which is deemed a "conditional release," N.Y. Exec. Law § 510–a. *See In re Anthony "D",* 274 A.D.2d 727, 710 N.Y.S.2d 203, 204 (3d Dep't 2000) ("Pursuant to the terms and conditions of [the day placement] program, respondent was considered to be 'in facility' until such time as he was conditionally released and placed in an 'aftercare' program."). Nor is Yu's situation analogous to the revocation of the right to participate in a parole program, a pre-parole conditional supervision program, or a work-release program, all of which have been held to implicate protected liberty interests triggering due process requirements. *See Young v. Harper,* 520 U.S. 143, 117 S.Ct. 1148, 137 L.Ed.2d 270 (1997) (conditional supervision program); *Morrissey v. Brewer,* 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972) (parole); *Kim v. Hurston,* 182 F.3d 113 (2d Cir. 1999) (work-release). Although the aftercare program may be analogous to such programs in that it is a conditional release

---

**9.** Further, it is not clear that N.Y. Comp. Codes R. & Regs. tit. 9, § 178.13(b) requires that the director's written notice of termination be sent to the youth and/or his guardians. However, because Yu does not challenge the lack of post-transfer notice, we need not resolve that question at this time.

program, day placement is more restrictive. In day placement, the youth may reside at home but must report to the ERC daily for evening and weekend supervision. In *Young,* the Supreme Court stated, "[t]he essence of parole is release from prison, before the completion of sentence, on the condition that the prisoner abide by certain rules during the balance of the sentence." 520 U.S. at 147, 117 S.Ct. 1148 (quoting *Morrissey,* 408 U.S. at 477, 92 S.Ct. 2593). The pre-parolees in *Young* were required to report to their parole officers only weekly, *see id.* at 149–50, 117 S.Ct. 1148; the ERC participants, however, are supervised by OCFS on a daily basis.

Moreover, the ERC and Ella McQueen are both part of the unified OCFS "Day Placement" program that provides alternatives to incarceration. Youths at both Ella McQueen and the ERC may leave the facility for schooling or work. While it is not an insignificant difference that youths in the ERC may sleep at home, we find that this distinction is not sufficient to trigger a protected liberty interest. We therefore conclude that the applicable precedent is *Meachum v. Fano,* 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976), in which the Supreme Court held that due process rights did not attach when inmates were transferred from a lower-security prison to a higher-security one within the same state prison system.

Finally, it is significant that the ERC consent and admittance forms make clear that participation in that program is a privilege, not a right. The "Parental Consent" form states: "I understand that … the Division has chosen to allow Raymond Yu to participate in this program…. I also understand that the Division for Youth may also choose to terminate this arrangement if satisfactory progress has not been made according to the Division."

The "Conditions of Participation" form, signed by Yu, expressly states: "I understand that I am on Facility Placement Status but I have been chosen to participate in this alternative program in my home community. I understand that participation in the [ERC] is not Aftercare Status and it is a privile[g]e." Further, Yu was not transferred directly from the ERC to Ella McQueen.. Rather, he was transferred from Riker's, where he was undoubtedly held after a probable cause hearing, to Ella McQueen. Any lack of another hearing, therefore, was harmless in addition to not being required.

c) *False Imprisonment*

Huang next contends that Yu should have been released on December 20, 1997, because the time served at Riker's should have been credited to his sentence with OCFS. In support, Huang relies on New York Executive Law § 510–b(7), which provides:

> When a child who is placed with [OCFS] … is absent from a division facility or an authorized agency without the consent of the director of such facility or authorized agency, the absence shall interrupt the calculation of the time of such placement or commitment and such interruption shall continue until the return of the child to the facility or authorized agency in which the child was placed or committed. Any time spent by such child in custody from the date of absence to the date the placement … resumes *shall be credited* against the time of such placement or commitment *provided:*
>
> > (a) That such custody was due to an arrest or surrender based upon the absence; or
> >
> > (b) *That such custody arose from an arrest or surrender on another charge*

*which did not culminate in a conviction, adjudication or adjustment.*

N.Y. Exec. Law § 510–b(7) (emphases added). Because the charge on which Yu was held at Riker's was not based on his being AWOL from OCFS, the only applicable provision entitling Yu to credit is Subsection 510–b(7)(b). The district court held that "a plain reading of the statute indicates that OCFS was correct in its decision not to credit Yu for this period of time" because "Yu's time on Rikers Island did arise from an arrest on another charge, and did culminate in a conviction." *Huang,* 1999 WL 760633, at \*4.

As framed by the district court, the relevant question is whether Yu was ultimately convicted for the charge on which he was held at Riker's, as indeed he was when he pleaded guilty to those charges on May 27, 1998. However, the plea came more than a month after his release from OCFS custody on April 23, 1998, and, therefore, several months after OCFS's decision not to credit him for the time spent at Riker's. The resultant question is whether, under the statute, it was appropriate for OCFS to deny credit before the outcome of Yu's criminal case had been determined.

The parties take predictable stances on that question, although appellees appear to argue in the alternative that, quite apart from whether and when a conviction on the Riker's charge was entered, Yu was not entitled to credit for the length of time that he was not in OCFS custody. Because Yu was in the custody of the Department of Corrections for the eighty-three days in question, they argue, he was not entitled to credit for time served, whether or not convicted on the Riker's charge. The parties further dispute—and have submitted supplemental briefing on—whether *Heck v. Humphrey,* 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994),

prohibits a Section 1983 claim on these facts. We turn first to the *Heck* question, and then to the proper interpretation of Section 510–b(7).

### 1) *Application of the Heck Rule*

In *Heck,* the Supreme Court held:

[I]n order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus, 28 U.S.C. § 2254.

512 U.S. at 486–87, 114 S.Ct. 2364 (footnote omitted). The Court's rationale was based, in part, on a desire to "avoid[ ] parallel litigation over the issues of probable cause and guilt," prevent "the creation of two conflicting resolutions arising out of the same or identical transaction," and preclude "a convicted criminal defendant [from making a] ... collateral attack on the conviction through the vehicle of a civil suit." *Id.* at 484, 114 S.Ct. 2364 (internal quotation marks and citations omitted). In *Edwards v. Balisok,* 520 U.S. 641, 117 S.Ct. 1584, 137 L.Ed.2d 906 (1997), the Court held that *Heck* barred a suit challenging procedural defects at a hearing at which the inmate's good-time credits were revoked because the defects, if established, would imply the invalidity of that revocation. We have interpreted *Edwards* as focusing primarily on the fact that underlying the inmate's claim was a challenge to the length of his confinement. *See Jenkins v. Haubert,* 179 F.3d 19, 25 (2d Cir. 1999).

Most recently, in *Spencer v. Kemna*, 523 U.S. 1, 118 S.Ct. 978, 140 L.Ed.2d 43 (1998), the Court addressed circumstances in which a petitioner who had completed his entire sentence sought a writ of habeas corpus on the ground that his parole had been improperly revoked. The Court held that, although the petition was filed before the petitioner's incarceration had terminated, the expiration of his sentence rendered the petition moot, because the petitioner had not suffered collateral consequences from the revocation sufficient to meet Article III's injury-in-fact requirement. *See* U.S. Const. art. III, § 2, cl. 1; *Spencer*, 523 U.S. at 14–16, 118 S.Ct. 978. However, five Justices agreed in *Spencer* that the petitioner could still bring a Section 1983 action to redress the alleged wrongs. Justice Souter's concurrence, which was joined by three other Justices, stated:

> [W]e are forced to recognize that any application of [*Heck*'s] favorable-termination requirement to § 1983 suits brought by plaintiffs not in custody would produce a patent anomaly: a given claim for relief from unconstitutional injury would be placed beyond the scope of § 1983 if brought by a convict free of custody (as, in this case, following service of a full term of imprisonment), when exactly the same claim could be redressed if brought by a former prisoner who had succeeded in cutting his custody short through habeas.

The better view, then, is that a former prisoner, no longer "in custody," may bring a § 1983 action establishing the unconstitutionality of a conviction or confinement without being bound to satisfy a favorable-termination requirement that it would be impossible as a matter of law for him to satisfy. Thus, the answer to [petitioner's] argument that his habeas claim cannot be moot because *Heck* bars him from relief under § 1983 is that *Heck* has no such effect. After a

prisoner's release from custody, the habeas statute and its exhaustion requirement have nothing to do with his right to any relief.

*Id.* at 20–21, 118 S.Ct. 978 (Souter, J., concurring) (footnote omitted). Justice Stevens's dissent also recognized that "[g]iven the Court's holding that petitioner does not have a remedy under the habeas statute, it is perfectly clear ... that he may bring an action under 42 U.S.C. § 1983." *Id.* at 25 n. 8, 118 S.Ct. 978 (Stevens, J., dissenting). Moreover, dictum in the majority opinion also suggested that the petitioner would not be barred under *Heck* from bringing a Section 1983 action provided "petitioner were to seek damages 'for using the wrong procedures, not for reaching the wrong result,' and if that procedural defect did not 'necessarily imply the invalidity of' the revocation." *Id.* at 17, 118 S.Ct. 978 (quoting *Heck*, 512 U.S. at 482–83, 487, 114 S.Ct. 2364).

We have addressed similar issues under the *Heck* rule. In *Jenkins*, we held that "for those cases at the heart of habeas corpus—those in which a prisoner challenges the fact or length of his confinement—habeas is the exclusive federal remedy." *Jenkins*, 179 F.3d at 24. However, *Jenkins* involved an inmate's challenge to the conditions of confinement rather than its fact or duration, and we therefore held that *Heck* did not apply. *See id.* at 27. In *Leather v. Eyck*, 180 F.3d 420 (2d Cir. 1999), we further held that a plaintiff who was convicted on a charge of driving while impaired, but who was fined rather than imprisoned, was not barred under *Heck* from bringing a Section 1983 action because,

> [a]lthough [plaintiff's] action does not challenge conditions of confinement, *Jenkins* implies the inapplicability of *Heck* for [him]. Because [plaintiff] is not and never was in the custody of the

State, he, like Jenkins, has no remedy in habeas corpus. Having escaped the jaws of *Heck*, Leather should therefore be permitted to pursue his § 1983 claim in the district court unless principles of res judicata or collateral estoppel preclude his suit.

*Id.* at 424; *see also Sims v. Artuz*, 230 F.3d 14, 24 (2d Cir.2000) (holding Section 1983 action not barred where challenge is to conditions of confinement, rather than fact or duration).

■ Based on these authorities, we conclude that *Heck* does not bar Huang's Section 1983 action. While Huang's challenge is aimed at the duration of Yu's confinement, she does not challenge the validity of Yu's conviction. Furthermore, Yu has no habeas remedy because he has long since been released from OCFS custody. In light of our holding in *Leather*, and in light of both the *Spencer* majority's dictum and the fact that the *Spencer* concurrences and dissent "revealed that five justices hold the view that, where federal habeas corpus is not available to address constitutional wrongs, § 1983 must be," *Jenkins*, 179 F.3d at 26, we conclude that Huang's Section 1983 claim must be allowed to proceed. Having so decided, we now turn to the merits of the false imprisonment claim.

### 2) *Calculation of Yu's Release Date*

Whether Yu's rights were violated turns upon the meaning of Executive Law Subsection 510–b(7)(b). If that provision means that a period of pre-trial detention served on an unrelated charge must be credited to a youth's confinement with OCFS, so long as the charge does not result in a conviction before the youth's confinement with OCFS ends, whether or not there is an ultimate conviction, then Yu was unlawfully detained after his release date. Unfortunately, there is no helpful New York authority on the precise inter-

pretation of Section 510–b(7) pertinent to this appeal. *See, e.g., In re Angel F.*, 273 A.D.2d 71, 709 N.Y.S.2d 76, 76 (1st Dep't 2000) (holding credit due for time served on charges that were "eventually dismissed" but not stating whether dismissal occurred before OCFS sentence expired and whether the time on the unrelated charges was served in OCFS custody); *In re Anthony "D"*, 710 N.Y.S.2d at 204 (holding no credit due on OCFS sentence for time served in state jail because the "unrelated criminal charges culminated in a conviction," but not stating whether conviction occurred prior to expiration of OCFS sentence).

Indeed, it is less than clear that OCFS even has a uniform practice in the manner in which it applies Subsection 510–b(7)(b). Appellees state only that "the computer system maintained by OCFS uniformly and automatically interrupts the time credit of a youth upon the entry of a noted absence" and that the "interruption continues unless and until OCFS is notified of an event under [510–b(7)] subsections a) or b), in which event the appropriate time credit" is given. Appellees' Post–Argument Letter Memorandum at 7 n. 1, *Huang* (No. 99–9226). This, however, tells us nothing of the criteria used to determine whether an "event" under 510–b(7)(b) has occurred.

Moreover, appellees' deposition testimony suggests substantial confusion over the proper interpretation of the statute. Appellees Anderson and Barbour indicated that the key factor is not whether there has been a conviction but whether the youth is being held outside of OCFS custody. That view seemingly assumes that time served in the jurisdiction of another agency, such as the Department of Corrections, cannot be credited to confinement with OCFS. Appellee Ivan Johnson agreed with Anderson and Barbour but also noted that there have been situations in which

credit has been given for time served in another jurisdiction's custody. Appellees' brief states that the key factor is whether the unrelated arrest eventually ends in a conviction but also states that Yu was not credited for either the AWOL period or the period of time served because, during both, he was "outside of OCFS supervision." Brief for Defendants–Appellees at 14–15, *Huang* (No. 99–9226).

We are mindful of the somewhat anomalous result to which Huang's proposed interpretation leads. A youth would be credited for pre-trial detention time served after committing a serious crime simply because the conviction occurs after release. However, appellees' position that a post-release conviction validates a denial of credit for time served elsewhere is itself anomalous. A youth might serve the extra time as a result of the denial of credit and then be acquitted. Finally, appellees' alternative position that credit must be denied for periods of time served "outside of OCFS supervision," *id.*, seems hard to square with the statutory language.

■ We believe that the interpretation of Subsection 510–b(7)(b) should be determined by the New York Court of Appeals upon a Certificate from this court. *See* N.Y. Comp.Codes R. & Regs. tit. 22, § 500.17; 2d Cir. R. § 0.27. The statute has no inexorable interpretation, and there is no governing caselaw on point. Confusion as to the statute also seems to exist among New York correctional officials. Rather than set a precedent that may differ from the view of the New York Court of Appeals and possibly be disruptive in New York correctional affairs, we think that the better course of action is for the New York court to decide this important issue of New York law. Moreover, given our holding that *Heck* does not bar false imprisonment claims when the plaintiff has no remedy in habeas corpus, we may see other false imprisonment claims such as the present one brought under Section 1983. We hasten to add that our Certificate invites the New York Court of Appeals to address any other issue of New York law bearing on the disposition of this appeal.

## CONCLUSION

The decision of the district court that a hearing was not required prior to Yu's return to Ella McQueen is affirmed. However, we reverse the district court's conclusion that Huang's claims are barred by the Eleventh Amendment. We further hold that *Heck* does not bar Huang's 42 U.S.C. § 1983 action for false imprisonment. However, we certify to the New York Court of Appeals the question of whether appellees properly refused to credit to Yu's sentence with OCFS the time he served at Riker's Island. It is hereby ORDERED that the Clerk of the Court transmit to the Clerk of the New York Court of Appeals a Certificate in the form attached, together with this Opinion and a complete set of the briefs, appendices, and record filed by the parties with this court. This panel retains jurisdiction so that, after we receive a response from the New York Court of Appeals, we may dispose of the appeal. Further, the parties are ordered to bear equally such fees and costs, if any, as may be requested by the New York Court of Appeals.

## UNITED STATES COURT OF APPEALS

### FOR THE SECOND CIRCUIT

At a stated term of the United States Court of Appeals for the Second Circuit, held at the United States Courthouse, Foley Square, in the City of New York, on the 17th day of May, two thousand one.

Present: HONORABLE WILFRED FEINBERG,

HONORABLE RALPH K. WINTER,
HONORABLE JOSÉ A. CABRANES,
*Circuit Judges.*

No. 99–9226

Michelle HUANG, as next of friend
of Raymond Yu, a minor,
*Plaintiff–Appellant,*

v.

John A. JOHNSON, Commissioner for the Office of Children and Family Services, formerly known as the Division for Youth, Thomas McGregor, Ray Anderson Matthew Barbour and Ivan Johnson, Defendants–Appellees.

Pursuant to N.Y. Comp. Codes R. & Regs. tit. 22, § 500.17 and 2d Cir. R. § 0.27, we present the following Certificate to the New York Court of Appeals:

1. This is a 42 U.S.C. § 1983 action for damages and injunctive relief brought by Michelle Huang on behalf of her infant son, Raymond Yu. Huang argues that Yu's Fourth and Fourteenth Amendment rights were violated when appellees, officials of New York State's Office of Children and Family Services ("OCFS"), falsely imprisoned him by refusing to credit to his sentence with OCFS eighty-three days he served in the custody of the New York City Department of Corrections at Riker's Island. In March, 1997, Yu went AWOL from OCFS custody for ninety-six days until July 2, 1997, when OCFS learned that Yu was being held at Riker's on an unrelated criminal charge. Yu spent eighty-three more days at that facility before being returned to OCFS custody. OCFS set back Yu's release date by the ninety-six days that he was AWOL as well as by the eighty-three days that he spent at Riker's. The district court denied Huang's motion for summary judgment and granted summary judgment to appel-lees on the ground that New York Executive Law Subsection 510-b(7)(b) expressly provides that time spent in custody on an unrelated charge that culminates in a conviction cannot be credited to a youth's sentence with OCFS. However, Yu did not plead guilty to the charge on which he was held at Riker's until May 27, 1998, more than one month after his April 23, 1998 release from OCFS custody.

2. The dispositive issue presented by this appeal for which there is no controlling precedent of the New York Court of Appeals is whether appellees properly refused to credit Yu, under New York Executive Law Subsection 510-b(7)(b), for the eighty-three days served at Riker's on an unrelated charge that did not culminate in a conviction until after Yu's release from OCFS custody.

3. We request that the New York Court of Appeals address the above question at this time because the text of Subsection 510-b(7)(b) does not provide a clear answer. Moreover, if not definitively answered pursuant to this Certificate, the question will recur in federal actions because claims for false imprisonment are frequently brought in Section 1983 actions and we have held today that such claims are permitted under 42 U.S.C. § 1983 when asserted by a prisoner after release.

4. The New York Court of Appeals is invited to address any other issue of New York law presented by this appeal.

FOR THE COURT:
ROSEANN B. MACKECHNIE, Clerk

ROSEANN B. MACKECHNIE    5/17/01
By:                        Date: