**UNITED STATES of America,**
**Appellee,**

v.

**William VARGAS, aka William Fargas,**
**Defendant–Appellant.**

**Docket No. 99–1044.**

United States Court of Appeals,
Second Circuit.

May 20, 2003.

Marc Fernich, New York, N.Y., for Defendant–Appellant.

Jo Ann M. Navickas, Assistant United States Attorney (David C. James, Assistant United States Attorney), for Roslynn R. Mauskopf, United States Attorney, Eastern District of New York, Brooklyn, N.Y., for Appellee, of counsel.

Present: OAKES, WINTER, and KATZMANN, Circuit Judges.

### Summary Order

**ORDERED, ADJUDGED, AND DECREED** that the appeal is **DISMISSED** in part, and the judgment of the District Court is **AFFIRMED** in part.

On April 22, 1997, defendant-appellant William Vargas was charged in a superseding indictment with one count of conspiring to possess with intent to distribute heroin, 21 U.S.C. § 846, and one count of possessing with intent to distribute heroin, *id.* § 841(a)(1), (b)(1)(B). The government contends that Vargas participated in a narcotics trafficking conspiracy, which entailed couriers transporting drugs from Colombia to the United States by swallowing balloons filled with approximately seven grams of heroin per balloon.

Vargas suffers from a medical condition known as facial hemangioma, which has resulted in an unsightly tumor near his ear. In course of Vargas's detention preceding his eventual guilty plea, the tumor grew substantially. A court-ordered physician examined Vargas and concluded that his condition was neither life-threatening nor even serious. The District Court permitted Vargas to have another doctor examine him at the MDC, but Vargas later claimed that he was unable to afford the doctor's $2,000 fee. After Vargas objected to the court-ordered physician's medical conclusions, the court responded, "We have a report of the doctor. You were supposed to get a doctor of your own to examine him and to refute this. You tell me that you can't afford it, so I don't think there is anything else I can do." The court promised, however, that "[i]f there is a conviction through a plea or otherwise, I can direct the Bureau of Prisons to treat this—the defendant at whatever institution he goes and I will do that."

On March 3, 1998, Vargas pleaded guilty to the indictment and, on January 8, 1999, Vargas was sentenced. At sentencing, Vargas's counsel explained to the court that he had advised his client against demanding a *Fatico* hearing on his role in the offense because the hearing could backfire and possibly result in a longer term of incarceration. Vargas ultimately agreed with his counsel's recommendation and informed the court that he wanted to "accept the sentence today." The court applied a two-level managerial role enhancement, thereby barring "safety valve" protection, and sentenced Vargas to the crime's mandatory minimum of sixty months imprisonment. *See* U.S.S.G. § 5C1.2(a)(4) (making a defendant ineligible for the "safety valve" provision if he was "an organizer, leader, manager, or supervisor of others in the offense, as determined under the sentencing guidelines"). The court also sentenced Vargas to a five-year term of supervised release and a special assessment of $100. Vargas was released from prison and deported to Colombia in July 2001.

On appeal, Vargas argues that his guilty plea must be voided because he was "so concerned about dying that he was willing to take the plea regardless of its conse-

quences." Vargas also challenges the length of his incarceration, alleging that he involuntarily waived a *Fatico* hearing and that the District Court clearly erred in finding that he played a managerial role in the offense.

Because a defendant who pleads guilty "waives several constitutional rights, including his privilege against compulsory self-incrimination, his right to trial by jury, and his right to confront his accusers," an involuntary guilty plea is "obtained in violation of due process and is therefore void." *McCarthy v. United States,* 394 U.S. 459, 466, 89 S.Ct. 1166, 22 L.Ed.2d 418 (1969). A guilty plea "is deemed 'voluntary' if it is not the product of actual or threatened physical harm, mental coercion overbearing the defendant's will, or the defendant's sheer inability to weigh his options rationally." *Miller v. Angliker,* 848 F.2d 1312, 1320 (2d Cir.1988). The Supreme Court has indicated that sufficient mental coercion so as to invalidate a guilty plea occurs if the defendant was so gripped by fear "that he did not or could not, with the help of counsel, rationally weigh the advantages of going to trial against the advantages of pleading guilty." *Brady v. United States,* 397 U.S. 742, 750, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970).

■ Vargas and his counsel repeatedly expressed concern about Vargas's facial hemangioma. The court agreed that the condition looked serious, characterizing the ear as "an ugly mess" and "an ugly sight" and observing that it "needs some cosmetic surgery." Notwithstanding the apparent gruesome appearance of the tumor, however, the record belies Vargas's contention that he had no choice but to plead guilty to save his life. A report from a Colombian doctor who examined Vargas reveals that Vargas has suffered from the hemangioma since he was an infant. While in Colombia, Vargas passed on the

opportunity to have a doctor treat the tumor, supposedly out of concerns on the quality of medical service. Additionally, the doctor who examined Vargas at the Bureau of Prisons concluded that his condition was not serious. As the District Court noted, we are not in the proper position to "refute a medical opinion by a doctor." Furthermore, the court gave Vargas the opportunity to get another doctor to refute this medical opinion, but Vargas was unable to afford that option.

Vargas also points to the District Court's statement that, "[i]f there is a conviction through a plea or otherwise, I can direct the Bureau of Prisons to treat this—the defendant at whatever institution he goes to and I will do that." Vargas contends that this statement coerced him to plead guilty because it was the only way he could have received medical treatment. Analyzed in context, however, this statement was an innocuous statement in the course of discussions regarding the defendant's treatment. In addition, this statement was made to the defendant at a December 5, 1997 hearing. The defendant did not plead guilty until almost four months later, on March 3, 1998. Therefore, whatever impact this statement may have had on the defendant's decision to plead guilty was mitigated by the time delay.

Most importantly, the transcript of the plea hearing confirms the voluntary nature of the plea. In the course of the court's Rule 11 colloquy, the defendant gave several answers that refute his allegation of coercion, including the following:

Q. Are you currently under the influence of any drug, medication or alcohol beverage?

A. No. I'm under medication for this problem [the facial hemangioma].

Q. Do you know what kind of medicine you're taking?

A. Tylenol.

Q. Does this affect your judgment, your reasoning process?

A. No, your Honor.

. . . .

Q. Now, has anyone made any promises to you to induce you to plead guilty today?

A. No, your Honor.

Q. Have there been any threats against you to induce you to plead guilty today?

A. No, your Honor.

Vargas then admitted his guilt in the heroin trafficking conspiracy. Vargas explained that he went to Kennedy Airport to pick up David Schmidt and take him to Maria Munoz "so she would have him stay at her house and [Schmidt] would evacuate the twenty pills he had brought." Vargas admitted to knowing that these pills were heroin when he picked Schmidt up from the airport.

■ Turning to Vargas's sentencing claims, we begin with the threshold issue of jurisdiction. Vargas was released from custody on July 6, 2001, and was deported to Colombia on July 23, 2001. The government maintains that Vargas's release from prison has rendered his sentencing claims moot. Vargas responds with two arguments. First, Vargas contends that his sentence is not complete because he remains subject to a four-year term of supervised release. Vargas argues that were we to agree with his sentencing claims, the District Court might reduce his supervised release term on remand. Vargas also argues that Article III confers jurisdiction on a case-by-base basis, not an issue-by-issue basis. Therefore, Vargas contends that jurisdiction over his conviction triggers jurisdiction over his entire case, including his sentencing claims.

Article III, Section 2 of the United States Constitution limits federal subject matter jurisdiction to those cases that present a "case or controversy." This "case or controversy" requirement "subsists through all stages of federal judicial proceedings, trial and appellate" and requires that the parties "continue to have a personal stake in the outcome of the lawsuit." *Spencer v. Kemna*, 523 U.S. 1, 7, 118 S.Ct. 978, 140 L.Ed.2d 43 (1998) (internal quotation marks and citations omitted); *accord United States v. Probber*, 170 F.3d 345, 347–48 (2d Cir.1999).

Vargas argues that his appeal presents a "case or controversy" because he remains under supervised release and, therefore, his sentence has not been completed. Vargas reasons that his "sentencing claims, if accepted by this Court, might well reduce any supervised release term imposed on remand." This argument, however, fails under our decision in *United States v. Mercurris*, 192 F.3d 290, 293 (2d Cir.1999), where we lacked jurisdiction over the sentencing claims of a defendant who had completed his prison term but was still on supervised release. Following the Supreme Court's decision in *Spencer*, 523 U.S. at 12 (refusing to extend the presumption of collateral consequences of convictions to parole revocation because parole revocations do not result in sufficient civil disabilities), we explained that the defendant did "not proffer, nor are we aware of any civil disabilities which attend the longer sentence he served as a result of the district court's application of the aggravated felony enhancement." *Mercurris*, 192 F.3d at 294; *see United States v. Ben Zvi*, 242 F.3d 89 (2d Cir.2001) (reaching similar result where defendant, who since had been released from custody, objected to the calculation of her offense level).

Further, the possibility that the District Court might alter his term of supervised release on remand is too remote and speculative to create jurisdiction. *See Ben Zvi*, 242 F.3d at 99. Similar to the situation in *Ben Zvi*, where the sentence's potential effect on the defendant's ability to obtain discretionary immigration relief failed to create jurisdiction, here too the court's decision to reduce supervised release would depend on a variety of factors of varying weight. *See id.*

■ Vargas's second argument also falls short of the mark. Vargas maintains that Article III confers jurisdiction on a "case-by-case" basis, not an "issue-by-issue" basis, and therefore jurisdiction over his conviction triggers jurisdiction over his sentence. This argument is precluded by *Ben Zvi*, where we dismissed for lack of jurisdiction the defendant's claims pertaining to her length of incarceration, but resolved the merits of the defendant's challenges to her conviction and her objections to the order of restitution. *Ben Zvi*, 242 F.3d at 95–98, 99. In *Ben Zvi*, we did precisely what Vargas claims cannot be done by assessing jurisdiction, specifically mootness, on an "issue-by-issue" basis.

We have reviewed all of the defendant-appellant's arguments and, for reasons stated above, dismiss the sentencing claims and affirm the judgment of conviction.