*This opinion is subject to revision before final
publication in the Pacific Reporter*

**2014 UT 17**

IN THE

## SUPREME COURT OF THE STATE OF UTAH

STATE OF UTAH,
*Plaintiff and Appellee,*
*v.*
KENNETH TROTTER,
*Defendant and Appellant.*

No. 20111056
Filed May 20, 2014

The Honorable G. Michael Westfall
Fifth District, Cedar City Dep't
No. 071500541

Attorneys:

Sean D. Reyes, Att'y Gen., Jeffrey S. Gray, Asst. Att'y Gen.,
Salt Lake City, for plaintiff

J. Bryan Jackson, Matthew D. Carling, Cedar City, for defendant

JUSTICE DURHAM authored the opinion of the Court, in which
CHIEF JUSTICE DURRANT, ASSOCIATE CHIEF JUSTICE NEHRING,
JUSTICE PARRISH, and JUSTICE LEE joined.

JUSTICE DURHAM, opinion of the Court:

### INTRODUCTION

¶1 In 2007, Kenneth Trotter pled guilty to unlawful sexual conduct with a minor. Mr. Trotter later moved to withdraw his guilty plea, claiming it was not made voluntarily or knowingly because his defense counsel and the trial court failed to advise him that his plea would carry with it the requirement that he register as a sex offender. Mr. Trotter argued that this failure amounted to ineffective assistance of counsel in violation of the Sixth Amendment and a violation of rule 11 of the Utah Rules of Criminal Procedure. The district court denied Mr. Trotter's motion to withdraw because it held that the registration requirement was a collateral consequence of the guilty plea, and therefore neither defense counsel nor the district court had an obligation to inform him of that consequence. Mr. Trotter appeals that denial.

¶2 We hold that the requirement to register on the state's sex offender registry is properly classified as a collateral consequence of

a defendant's guilty plea. Therefore, neither defense counsel nor the trial court is constitutionally compelled to inform a defendant of the registration requirement before a guilty plea may be accepted as knowing and voluntary. We thus affirm the decision of the district court.

## BACKGROUND

¶3    In 2007, Mr. Trotter, then twenty years old, was arrested and charged for having sexual intercourse with two minor girls between the ages of fourteen and sixteen. Mr. Trotter's public defender advised him to plead guilty to the unlawful sexual conduct in exchange for a reduction of his charge to a class A misdemeanor. It appears from the record that neither defense counsel nor the trial court informed Mr. Trotter that if he pled guilty, he would be required to register on the state's sex offender registry. The trial court followed the procedures outlined by rule 11 of the Utah Rules of Criminal Procedure to confirm with Mr. Trotter that his plea was freely, knowingly, and voluntarily given. Mr. Trotter acknowledged this fact in writing, and the plea was subsequently accepted by the court in March 2009.

¶4    Mr. Trotter later hired private counsel and filed a motion requesting to withdraw his guilty plea. Mr. Trotter argued that his plea was not made voluntarily and knowingly as required by the Due Process Clause of the United States Constitution and Utah Code section 77-13-6(2)(a) (Plea Withdrawal Statute) because the trial court did not inform him of the sex offender registration requirement. Alternatively, he claimed that his public defender's failure to inform him of the registration requirement amounted to ineffective assistance of counsel in violation of the Sixth Amendment. At this point, Mr. Trotter's sole argument was that the registration requirement was a direct rather than collateral consequence of his guilty plea, meaning that the court and defense counsel were obligated to ensure he understood the requirement prior to his submitting—and the court accepting—his guilty plea. The State responded by arguing that sex offender registration was a collateral consequence of the plea, so that neither the court nor defense counsel was constitutionally obligated to disclose this consequence for his plea to be valid. In July 2011, the trial court denied Mr. Trotter's motion to withdraw his plea, holding that the requirement to register on the sex offender registry, despite its definite and automatic nature, was not a direct consequence of the plea.

¶5 Three months later, but prior to his sentencing, Mr. Trotter again attempted to withdraw his guilty plea in October 2011, this time advancing a new argument for withdrawal. Mr. Trotter argued that the United States Supreme Court's decision in *Padilla v. Kentucky*, 559 U.S. 356 (2010)—which stated that defendants have a constitutional right to be informed of the deportation risks of a guilty plea—should also extend to the sex offender registration requirement. Mr. Trotter argued that *Padilla* rendered the distinction between direct and collateral consequences of a guilty plea immaterial whenever a consequence is severe enough to warrant discarding it. And due to the severity of the consequence of sex offender registration, Mr. Trotter urged the trial court to extend *Padilla*'s reasoning to the sex offender registry context and to conclude that because he was not informed of the registration requirement, his guilty plea was not knowing and voluntary and was therefore invalid. The district court rejected Mr. Trotter's arguments and denied his second motion to withdraw his plea. In November 2011, the court entered a judgment and sentence against Mr. Trotter on the unlawful sexual conduct charge. Mr. Trotter now appeals the district court's denial of his motion to withdraw his plea.

## STANDARD OF REVIEW

¶6 Though appellate review of a district court's denial of a motion to withdraw a guilty plea could implicate questions of law, questions of fact, and mixed questions of law and fact, the questions before us on this appeal—concerning the scope of *Padilla* and whether sex offender registration is a direct or collateral consequence of a plea—are pure questions of law reviewed for correctness. *See State v. Candland*, 2013 UT 55, ¶¶ 9–10, 309 P.3d 230. *See also Commonwealth v. Abraham*, 62 A.3d 343, 346 (Pa. 2012) (reviewing similar questions de novo).

## ANALYSIS

¶7 As noted above, Mr. Trotter advances two related arguments in support of his claim that the district court erred when it denied his motion to withdraw his guilty plea. Both arguments hinge on the fact that he was not informed, prior to entry of his guilty plea, that if he pled guilty he would be required to register as a sex offender. Mr. Trotter claims that the district court and his defense counsel were both required to inform him of this consequence and that by failing to do so, the district court violated rule 11 of the Utah Rules of Criminal Procedure and his defense counsel rendered constitutionally deficient performance under the Sixth Amendment to the United States Constitution.

¶8 We note that Mr. Trotter's claim of error on the part of the district court is improperly framed as a violation of rule 11. Mr. Trotter incorrectly assumes that rule 11 is the source of his right to withdraw a guilty plea that is unknowing and involuntary. The actual source of this right is the federal Due Process Clause; its derivative "knowing and voluntary" standard is further codified in Utah's Plea Withdrawal Statute. *See State v. Alexander*, 2012 UT 27, ¶ 19, 279 P.3d 371 ("Although rule 11 provides guidance for the entry of guilty pleas, any attempt to withdraw that plea is governed by statute. . . . This statutory ['knowing and voluntary'] standard mirrors the showing necessary for defendants to prove that their pleas are unconstitutional." (footnotes omitted)). And as we recently clarified in *Alexander*,

> compliance with rule 11 is not mandated by the Plea Withdrawal Statute or by the U.S. Constitution. . . . Thus, even if there was a violation of rule 11 during the plea hearing, appellate courts must continue to inquire into whether there is evidence that the plea was nonetheless knowingly and voluntarily made.

*Id.* ¶ 25. Accordingly, if a defendant's guilty plea was not knowing and voluntary and the district court refuses to allow a defendant to withdraw that plea, the federal Due Process Clause and our Plea Withdrawal Statute—not rule 11—would mandate that we reverse the district court's decision. We therefore proceed under the framework provided in Utah's Plea Withdrawal Statute.

¶9 Judges have discretion to grant a defendant's motion to withdraw a guilty plea only when "a defendant's plea was not knowingly and voluntarily entered." *State v. Ruiz*, 2012 UT 29, ¶ 32, 282 P.3d 998 (recognizing that the revised Plea Withdrawal Statute did away with the broad discretion previously given to judges on this matter); *see also* UTAH CODE § 77-13-6(2)(a) (2007). A guilty plea is made voluntarily and knowingly only if the defendant is "fully aware of the direct consequences" of his plea. *Brady v. United States*, 397 U.S. 742, 755 (1970) (internal quotation marks omitted). A direct consequence "is one that will have a definite, immediate and largely automatic effect on the range of the defendant's punishment such as lack of eligibility for parole." *State v. Smit*, 2004 UT App 222, ¶ 29, 95 P.3d 1203 (internal quotation marks omitted). A collateral consequence, on the other hand, is one that is unrelated to the length and nature of the sentence imposed on the basis of the plea. *See United States v. Hurlich*, 293 F.3d 1223, 1231 (10th Cir. 2002); *State v.*

*McFadden*, 884 P.2d 1303, 1304 (Utah Ct. App. 1994). The Sixth Amendment's right to counsel compels defense attorneys to ensure a defendant is aware of the direct consequences of his or her plea, *see Brady*, 397 U.S. at 755, while rule 11 of the Utah Rules of Criminal Procedure reflects the trial court's responsibility to do the same, *Alexander*, 2012 UT 27, ¶¶ 16–17.

¶10  Mr. Trotter argues that after *Padilla v. Kentucky*, 559 U.S. 356 (2010), the direct versus collateral consequence distinction is no longer relevant in determining whether defense counsel must inform a defendant regarding a particular consequence resulting from a guilty plea. Therefore, he argues, defendants should have a constitutional right to be informed of the sex offender registration consequence prior to entering their guilty plea, regardless of whether that consequence is deemed direct or collateral to the plea. Alternatively, Mr. Trotter asserts that even if the direct versus collateral distinction survived *Padilla*, the sex offender registration requirement is properly characterized as a direct rather than a collateral consequence of a defendant's guilty plea.

¶11  We disagree with both arguments. We conclude that *Padilla* did not dissolve the constitutional significance between direct and collateral consequences in contexts other than deportation. We further hold that the sex offender registration requirement is a collateral consequence, and therefore neither defense counsel nor the trial court was obligated to disclose it.

## I. DEFENSE COUNSEL DID NOT PROVIDE CONSTITUTIONALLY DEFICIENT ASSISTANCE BY FAILING TO INFORM MR. TROTTER THAT HE WOULD BE REQUIRED TO REGISTER AS A SEX OFFENDER AS A CONSEQUENCE OF HIS GUILTY PLEA

¶12 Mr. Trotter claims that his public defender provided ineffective assistance of counsel by failing to advise him that pleading guilty would result in his registration as a sex offender. As noted above, the Sixth Amendment generally requires defense counsel to inform clients of direct but not collateral consequences of a guilty plea. But Mr. Trotter would have us hold either that *Padilla* eviscerated the direct versus collateral distinction and that guilty pleas are always unknowing and involuntary unless defendants are informed of the sex offender registration requirement, or alternatively that the registration requirement is a direct consequence of his plea. The State responds that the direct versus collateral dichotomy survived *Padilla* and that the registration requirement is properly characterized as a collateral consequence.

Accordingly, the State argues that the Sixth Amendment did not compel Mr. Trotter's defense counsel to inform him that he would be required to register as a consequence of his guilty plea.

¶13 Generally, to resolve a claim of ineffective assistance of counsel, we would apply the two-prong test from *Strickland v. Washington*, 466 U.S. 668, 687 (1984), which requires the defendant to demonstrate that his or her defense counsel provided constitutionally deficient performance that resulted in prejudice. However, when the alleged deficient performance is defense counsel's failure to inform a client of a particular consequence of a guilty plea, we must first consider whether *Strickland* applies at all. *Chaidez v. United States*, __ U.S. __, 133 S. Ct. 1103, 1110 (2013). To do so, we must determine whether the particular consequence was direct or collateral to the plea. If direct, the Sixth Amendment's protections are triggered and we must undertake a *Strickland* analysis; if collateral, however, most courts hold—and we agree—that defense "counsel's failure to inform a defendant of the collateral consequence[]. . . is never a violation of the Sixth Amendment." *Id.* at 1109 (internal quotation marks omitted).

¶14 In *Chaidez*, the Court explained that when it approached the ineffective assistance issue in *Padilla*, its "first order of business was . . . to consider whether the widely accepted distinction between direct and collateral consequences categorically foreclosed Padilla's [Sixth Amendment] claim." *Id.* at 1111. The Court noted that nearly every state court and all lower federal courts that have addressed this issue have held that the "Sixth Amendment does not require attorneys to inform their clients of a conviction's collateral consequences." *Id.* at 1109. Indeed, the Court recognized that exclusion of advice about collateral consequences from the Sixth Amendment's scope was "one of the most widely recognized rules of American law." *Id.* (internal quotation marks omitted). And although the *Chaidez* Court did not expressly endorse the majority rule,[1] it clarified that *Padilla* did not "eschew the direct-collateral

---

[1] Although the United States Supreme Court has not directly answered the question whether there may be circumstances under which advice about a matter deemed collateral violates the Sixth Amendment, the clear majority rule is that "counsel's failure to inform a defendant of the collateral consequences of a guilty plea is never a violation of the Sixth Amendment." *Chaidez*, __ U.S. at __, 133 S. Ct. at 1109 (internal quotation marks omitted). We likewise hold that advice about collateral consequences is categorically

(continued...)

divide across the board," but simply recognized that the distinction was "ill-suited" to the unique circumstance of deportation. *Id.* at 1112 (internal quotation marks omitted).

¶15 We thus turn our attention first to the issue of whether Utah's sex offender registration requirement is sufficiently akin to deportation such that the direct-collateral divide is "ill-suited" to dispose of Mr. Trotter's claims. Since we hold that it is not, we then consider whether the registration requirement is properly categorized as a direct or collateral consequence.

*A. The Direct-Collateral Dichotomy Is Appropriately Applied to the Consequence of Sex Offender Registration*

¶16 As noted above, *Padilla* did not eliminate the direct-collateral distinction but merely carved out a special exception for advising defendants about the risk of deportation associated with a guilty plea. *Padilla* noted that this exception was premised on the "unique nature" of deportation. 559 U.S. at 365.

¶17 In *Padilla*, the Court explained that deportation's unique nature arose from the changes in immigration law that had "dramatically raised the stakes of a noncitizen's criminal conviction" and transformed deportation into "an integral part—indeed, sometimes the most important part—of the [criminal] penalty," akin to "banishment or exile." *Id.* at 364, 373 (footnote omitted) (internal quotation marks omitted). Removal from the country, the Court noted, is "nearly an automatic result for a broad class of noncitizen offenders." *Id.* at 366. The Court also recognized that deportation is a particularly "severe 'penalty'" and that it is difficult to separate it from the defendant's conviction. *Id.* at 365–66. Thus, the Court determined that deportation is uniquely ill-suited for the direct-collateral divide because (1) it results automatically from the entry of the plea, and (2) it is a particularly severe penalty. *Id.* at 366. Accordingly, any rationale for extending *Padilla*'s reasoning to other contexts, such as registration as a sex offender, must be rooted in both of these justifications.

¶18 Mr. Trotter cites several state court decisions to support his claim that *Padilla*'s rationale should be extended to the consequence

---

[1] (...continued)
excluded from the scope of the Sixth Amendment's protections. We accordingly need not reach the *Strickland* analysis where defense counsel's alleged deficiency was the failure to inform the defendant of a guilty plea's collateral consequences.

of sex offender registration. For example, the Georgia court of appeals in *Taylor v. State* ruled to extend *Padilla*'s reasoning to a registration requirement by relying on three primary justifications: the prevailing professional norms, the automatic nature of the requirement, and the severity of the requirement. 698 S.E.2d 384, 388–89 (Ga. Ct. App. 2010). We address each in turn.

¶19   First, the *Taylor* court cited the ABA Standards for Criminal Justice, which instruct defense counsel to advise their clients of the registration requirement before entering a guilty plea. *Id.* at 388. We certainly agree that best practices suggest that defense counsel should inform a defendant that his guilty plea carries with it the requirement to register as a sex offender, but best practices often extend beyond the minimum level of professional competence mandated by the Constitution. *See, e.g.*, *Whiting v. United States*, 231 F.3d 70, 76 (1st Cir. 2000) (stating that "there is daylight between desirable policy and the bare minimum required by the Constitution"). We conclude that is the case here.

¶20   The second two considerations raised by the *Taylor* court—the automatic nature and severity of the registration consequence—are relevant to our determination. First, *Taylor* noted that, just like deportation, Georgia's registration requirement was an automatic consequence of the crime to which Mr. Taylor pled guilty. 698 S.E.2d at 388. Similarly, Utah's registration requirement is automatically triggered if a person is convicted of certain crimes. *See* UTAH CODE §§ 77-41-106, 105(3)(a) (2013). But the automatic nature of the registration requirement cannot alone render the consequence identical to deportation; otherwise, other civil deprivations such as losing one's right to vote or carry a weapon would suffice to remove the consequence from the direct versus collateral dichotomy, which they do not. *See, e.g.*, *Spencer v. Kemna*, 523 U.S. 1, 8 (1998) (discussing a number of civil deprivations as a collateral consequence); *Kipp v. State*, 704 A.2d 839, 841–42 (Del. 1998) (discussing prohibition of deadly weapon possession); *Saadiq v. State*, 387 N.W.2d 315, 325 (Iowa 1986) (collecting cases on distinction between direct and collateral consequences). Thus, if the registration requirement is to be treated like deportation, it must be based not only on its automatic nature, but also on its severity.

¶21   We evaluated the severity of deportation and its impact on defendants when we decided *State v. Rojas-Martinez*, 2005 UT 86, 125 P.3d 930, *overruled by Padilla*, 559 U.S. 356. We recognized that deportation is an especially severe consequence because it is essentially the "'equivalent of banishment or exile.'" *Id.* ¶ 19

(quoting *Fong Haw Tan v. Phelan*, 333 U.S. 6, 10 (1948)). We also noted that deportation severely restricts the defendant's freedom of movement and opportunity because it "'deprives him of the right to stay and live and work in this great land.'" *Id.* (quoting *Reno v. Am. Arab Anti-Discrimination Comm.*, 525 U.S. 471, 497–98 (1999)). It also interferes with familial relationships and places great strain on the family when the separation occurs. *Id.* (citing *Santosky v. Kramer*, 455 U.S. 745, 787 (1982)).[2]

¶22 In addressing whether sex offender registration rises to the same level of severity as the consequence of deportation, we begin by acknowledging the serious social stigmas that attach to one who must register as a sex offender. Interested parties may easily locate by name and address any sex offender living in their neighborhood. In many instances, the most regrettable actions in an individual's life are posted for the public to see. Once identified as a sex offender, the individual may feel compelled to move away, quit a job, or stay indoors. The offender's family members and friends may also be ostracized, and a number of other social pressures may complicate and burden the offender's life upon registration. We do not mean to diminish in any way the real and significant civil and social burdens a sex offender must face as a result of registration. Nevertheless, we conclude that the statutory restrictions imposed on sex offenders—and the resulting social consequences—are not akin to the restrictions and consequences faced by deportees.

¶23 Under Utah Code section 77-27-21.7(2), a registered offender may not "be in any protected area on foot or in or on any vehicle." Protected areas under the statute include day care and preschool facilities, public swimming pools, primary and secondary schools, public parks, public playgrounds, and other areas designed for children to engage in recreational activity.[3] A protected area may

---

[2] The Supreme Court noted similar reasons when creating the deportation exception in *Padilla*, including the "steady expansion of deportable offenses" and the impact on an individual's ability to remain in the country. *Padilla*, 559 U.S. at 363.

[3] "'Protected area' means the premises occupied by: (i) any licensed day care or preschool facility; (ii) a swimming pool that is open to the public; (iii) a public or private primary or secondary school that is not on the grounds of a correctional facility; (iv) a community park that is open to the public; and (v) a playground that is open to the public, including those areas designed to provide
(continued...)

also include any area within one thousand feet of the victim's residence but only if the offender is on probation or parole and the victim affirmatively requests the buffer zone.[4] The victim's residence is also categorically excluded from the definition of "protected area" if the victim is a member of the offender's immediate family and the terms of the offender's probation or parole so allow.[5]

¶24 Furthermore, the statute affords additional exceptions to the definition of "protected area" that make its impact on the defendant far less severe than the consequence of deportation. For example, a sex offender may enter a protected area during times when the offender must be present to fulfill "necessary parental responsibilities."[6] Additionally, when the protected area is a school building, the offender may still enter when the building is being

---

[3] (...continued)
children space, recreational equipment, or other amenities intended to allow children to engage in physical activity." UTAH CODE § 77-27-21.7(1)(a).

[4] "'[P]rotected area' also includes any area that is 1,000 feet or less from the residence of a victim of the sex offender's offense . . . if: (A) the sex offender is on probation or parole for an offense . . . ; (B) the victim or the victim's parent or guardian has advised the Department of Corrections that the victim desires that the sex offender be restricted from the area . . . and authorizes the Department of Corrections to advise the sex offender of the area where the victim resides for the purposes of this Subsection . . . ; and (C) the Department of Corrections has notified the sex offender in writing that the sex offender is prohibited from being in the protected area . . . and has also provided a description of the location of the protected area to the sex offender." *Id*. § 77-27-21.7(1)(b)(i).

[5] "'Protected area' . . . does not apply to the residence and area surrounding the residence of the victim if: (A) the victim is a member of the immediate family of the sex offender; and (B) the terms of the sex offender's agreement of probation or parole allow the sex offender to reside in the same residence as the victim. *Id*. § 77-27-21.7(1)(b)(ii).

[6] "It is a class A misdemeanor for any sex offender to be in any protected area on foot or in or on any vehicle, including vehicles that are not motorized, except for: (a) those specific periods of time when the sex offender must be present within a protected area in order to carry out necessary parental responsibilities . . . ." *Id*. § 77-27-21.7(2)(a).

used for a "public activity" that is not a school-related function involving individuals under the age of eighteen.[7] Or, if the protected area is a licensed day care or preschool facility, the offender may enter when the building is open to the public for activities that are operated separately from the day care or preschool.[8] Aside from the ban on entering protected areas, it appears that the only other unique legal deprivation a registered sex offender suffers is the choice to change his or her name. *See* UTAH CODE § 77-41-105(9)(a) (2013).

¶25 Taken as a whole, these prohibitions, while onerous, do not rise to the same level of severity as deportation from the country. While deportation is similar to banishment or exile, a sex offender retains a good deal of freedom to conduct himself as he or she chooses. The offender's movement and activity is relatively uninhibited by registration, with the exception of certain protected areas under narrowly tailored circumstances. The offender may go to work, to school, to the gym, to the grocery store, to the movie theater, to the post office, and to a restaurant without violating any of the conditions set out by the registry laws. For the most part, the registered offender maintains the choice to live and work where he or she chooses.

¶26 Moreover, rather than permanently interfering with familial relationships in the way that deportation does, the registry allows offenders to continue to live with their families despite registration. This is true even if the victim is a member of the offender's immediate family, absent some other condition of probation or parole. And even if the offender's parole does not allow contact with the victim and requires the offender to live elsewhere, nothing in the statute itself prohibits visits and interactions with other family members. This is, again, a very different scenario from that of the defendant who is deported and is thereby permanently deprived of

---

[7] "[W]hen the protected area is a school building . . . (ii) being opened for or being used for a public activity; and (iii) not being used for any school-related function that involves persons younger than 18 years of age . . . ." *Id.* § 77-27-21.7(2)(b).

[8] "[W]hen the protected area is a licensed day care or preschool facility . . . located within a building that is open to the public for purposes, services, or functions that are operated separately from the day care or preschool facility located in the building, except that the sex offender may not be in any part of the building occupied by the day care or preschool facility." *Id.* § 77-27-21.7(c).

face-to-face contact with family in the United States. Moreover, the statute allows an offender to enter even protected areas on a very limited basis to carry out necessary parental responsibilities. Instead of removing the offender from his family unit as deportation would do, registration in Utah still allows the offender to function as a parent. On balance, the restrictions imposed by Utah's sex offender registration requirement seem to us significantly removed from banishment or exile.

¶27 Nevertheless, Mr. Trotter argues that the registration requirement "significantly impacts the defendant's unfettered liberty for years into the future." Although Mr. Trotter does not elaborate on that statement, we recognize that one way the defendant's liberty may be impacted is through the registration's public reporting requirements. *See id.* § 77-41-105 (2011). Under these requirements, a sex offender is obligated to deliver certain personal information, including addresses, fingerprints, a DNA specimen, internet identifiers, and professional licenses to the appropriate department or entity. *See id.* § 77-41-105(8). The Department of Corrections then publishes some, but not all, of this information on a website specifically maintained for this purpose. *See id.* § 77-41-110 (2012). Yet all of the information displayed on this website is information that is independently classified as public information, meaning members of the public can obtain the information by making a request pursuant to Utah Code section 63G-2-201(1). *See id.* § 77-41-108; *see also Femedeer v. Haun*, 227 F.3d 1244, 1250 (10th Cir. 2000) (stating that "public accessibility of information concerning a sex offender's conviction, including accessibility of that information through the Internet, is not punishment"). Although making this information public carries with it additional real and automatic social burdens, the severity of these burdens does not rise to same level as deportation. We therefore decline to extend *Padilla* to remove advice regarding the consequence of sex offender registration from the generally applicable direct-collateral dichotomy.

### B. The Sex Offender Registration Requirement Is a Collateral Consequence of a Defendant's Guilty Plea

¶28 Because we hold that *Padilla*'s reasoning does not extend to the registration requirement, we must now determine whether registering as a sex offender is properly categorized as a direct consequence or a collateral consequence of a defendant's guilty plea. A direct consequence has an immediate and automatic effect on the range of a defendant's punishments. *State v. Smit*, 2004 UT App 222,

¶ 29, 95 P.3d 1203. "Examples of direct consequences include the forfeiture of trial rights, the imposition of a mandatory term of imprisonment that results from an unconditional guilty plea, and the imposition of mandatory postrelease supervision," *People v. Peque*, 3 N.E.3d 617, 628 (N.Y. 2013) (citations omitted), including probation and the eligibility for parole, *see Smit*, 2004 UT App 222, ¶ 29; *United States v. Krejcarek*, 453 F.3d 1290, 1297 n.7 (10th Cir. 2006).

¶29 Conversely, a consequence is collateral if it is unrelated to the length and nature of the sentence imposed on the basis of the plea. *United States v. Hurlich*, 293 F.3d 1223, 1231 (10th Cir. 2002); *State v. McFadden*, 884 P.2d 1303, 1304 (Utah Ct. App. 1994). It is a consequence that is based more on the individual's personal circumstances, *see Peque*, 3 N.E.3d at 628, and is "beyond the control and responsibility of the district court in which [the] conviction was entered." *United States v. Gonzalez*, 202 F.3d 20, 27 (1st Cir. 2000), *overruled on other grounds by Padilla*, 559 U.S. 356. "Illustrations of collateral consequences are loss of the right to vote or travel abroad, loss of civil service employment, loss of driver's license, loss of the right to possess firearms or an undesirable discharge from the armed services." *People v. Ford*, 657 N.E.2d 265, 267–68 (N.Y. 1995) (citations omitted). Consequences that can be "foreseen because of the automatic operation of statutes" may also count as collateral. *Aldus v. State*, 748 A.2d 463, 469 n.6 (Me. 2000).

¶30 We hold that the registration requirement is properly characterized as a collateral consequence because, although automatic in effect, it is unrelated to the range of the defendant's punishments. Unlike parole, probation, or the length of imprisonment, the requirement to register as a sex offender is beyond the control of the trial court. The judge has no discretion whatsoever in determining whether the defendant will have to comply with registration statutes; instead, it is a legal obligation, predetermined by the legislature, placed on those convicted of particular crimes and is an automatic operation of statute. Similar to the consequence of losing one's driver's license or the right to possess a firearm, the registration requirement is intended to act not as a criminal punishment but as a prophylactic civil remedy. *See, e.g.*, *Smith v. Doe*, 538 U.S. 84, 95–96 (2003) (holding that Alaska's registration requirement was a civil remedy and nonpunitive); *United States v. Carel*, 668 F.3d 1211, 1213 (10th Cir. 2011) (determining that the registration requirement of the federal sex offender registry law is a "civil component"); *Femedeer*, 227 F.3d at

1249–53 (evaluating aspects of Utah's registration laws and determining that they constitute a "civil remedy"); *State v. Holt*, 2010 UT App 138, ¶ 12 n.7, 233 P.3d 828, *overruled on other grounds by State v. Johnson*, 2012 UT 68, 290 P.3d 21 (noting that "[r]egistration as a sex offender is not considered a criminal penalty, but rather a civil penalty" (internal quotation marks omitted)).

¶31 For instance, in *Femedeer* the Tenth Circuit evaluated the nature of Utah's sex offender registry Internet notification system, which derives from the existing registration database. It found that the Utah Legislature's intent in creating the system "was clearly to establish a civil remedy." 227 F.3d at 1249. The court observed that legislative intent may be ascertained from "the simple fact that the legislature placed the statute in the civil code as opposed to the criminal code." *Id.* (internal quotation marks omitted). Furthermore, the court determined that the system promoted civil goals including "deterrence, avoidance and investigation." *Id.* at 1252. It reasoned that the negative consequences imposed on sex offenders from the notification system—and impliedly from the underlying registration requirement—imposed "only a civil burden upon sex offenders." *Id.* at 1253.

¶32 The reasons identified by the *Femedeer* court in the context of the notification system are persuasive to us in determining that the registration requirement itself is a civil remedy. The requirement appears in the civil code rather than the criminal code, and the information is available only to those who affirmatively choose to seek it out. Moreover, the civil purposes advanced by the notification system—deterrence and avoidance—also underpin Utah's registration requirement. Indeed, the sex offender registry provides helpful information to parents in protecting their children from past offenders. It also offers an additional tool for making informed decisions regarding child care and victimization prevention.

¶33 We conclude that the registration requirement is a civil remedy and is properly categorized as a collateral consequence rather than a direct consequence of a defendant's guilty plea because it is unrelated to the length or nature of the sentence. *See McFadden*, 884 P.2d at 1304; *see also Peque*, 3 N.E.3d at 628 (identifying sex offender registration as a collateral consequence). Because we determine that the registration requirement is a collateral consequence, Mr. Trotter's trial counsel was not ineffective for failing to advise him of it prior to entering his guilty plea. *See Chaidez*, __ U.S. at __, 133 S. Ct. at 1109 (noting the strong judicial

consensus that "counsel's failure to inform a defendant of the collateral consequences of a guilty plea is never a violation of the Sixth Amendment" (internal quotation marks omitted)). We accordingly affirm the trial court's denial of Mr. Trotter's motion to withdraw his guilty plea on Sixth Amendment grounds. We take this opportunity to reemphasize, however, that attorneys follow best practices by advising their clients of the sex offender registration requirement when it is a condition of the client's guilty plea, even if doing so goes beyond the minimum standard mandated by the Constitution.

## II. A DEFENDANT'S GUILTY PLEA IS VOLUNTARY AND KNOWING NOTWITHSTANDING A TRIAL COURT'S FAILURE TO INFORM THE DEFENDANT OF THE REQUIREMENT TO REGISTER AS A SEX OFFENDER

¶34    Utah's Plea Withdrawal Statute states that "[a] plea of guilty . . . may be withdrawn only upon . . . a showing that it was not knowingly and voluntarily made." UTAH CODE § 77-13-6(2)(a). The United States Supreme Court has defined a "voluntary" plea as one made by a defendant who is "fully aware of the direct consequences" of his guilty plea. *Brady v. United States*, 397 U.S. 742, 755 (1970) (internal quotation marks omitted). Federal law almost universally holds that the due process guarantee entitles a defendant "to be informed of the direct, but not collateral, consequences of his plea." *Warren v. Richland Cnty. Circuit Court*, 223 F.3d 454, 457 (7th Cir. 2000); *see also United States v. Suter*, 755 F.2d 523, 525 (7th Cir. 1985) ("A defendant is entitled to be informed of the direct, not all the collateral, consequences of his plea."); *George v. Black*, 732 F.2d 108, 110 (8th Cir. 1984) ("[T]he accused need only be informed of the 'direct consequences' of the guilty plea. It is not necessary to attempt to inform the defendant of all the indirect or collateral consequences." (citation omitted)); *Michel v. United States*, 507 F.2d 461, 465 (2d Cir. 1974) (noting the "long-standing rule . . . that the trial judge when accepting a plea of guilty is not bound to inquire whether a defendant is aware of the collateral effects of his plea"). Although there is no Utah case law interpreting the Plea Withdrawal Statute to incorporate this well-ingrained principle of federal law, it is reflected in rule 11 of the Utah Rules of Criminal Procedure, which states that "a court is not required to inquire into or advise concerning any collateral consequences of a plea." UTAH R. CRIM. P. 11(e)(8). Today we hold that like the federal Due Process Clause, the Plea Withdrawal Statute's "knowing and voluntary" standard incorporates the principle that a guilty plea may be voluntarily given even if the defendant is uninformed of the plea's collateral consequences.

¶35    As a result, our prior conclusion that the registration requirement is a collateral consequence compels us to likewise conclude that the trial court had no responsibility under either the federal Due Process Clause or the Utah Plea Withdrawal Statue to inform Mr. Trotter that by pleading guilty he would be required to register on the state's sex offender registry. Since the district court is not required to advise a defendant of a plea's collateral consequences, the trial court's colloquy in Mr. Trotter's case was constitutionally sufficient to verify that Mr. Trotter pled guilty voluntarily and knowingly.

## CONCLUSION

¶36    We hold that the trial court did not abuse its discretion when it denied Mr. Trotter's motion to withdraw his 2009 guilty plea because the plea was entered voluntarily and knowingly. Further, we hold that the requirement to register as a sex offender as result of a defendant's guilty plea is a collateral consequence of that plea, which imposes no constitutional obligation on the trial court or on defense counsel to inform a defendant of that risk. For these reasons, we affirm the lower court's judgment.

———————